T.C. Memo. 2004-29

UNITED STATES TAX COURT

SUNOCO, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19631-97.          Filed February 4, 2004.

<u>Robert L. Moore II</u>, <u>Thomas D. Johnston</u>, and
<u>Marjorie A. Burnett</u>, for petitioner.

<u>John A. Guarnieri</u> and <u>Michael A. Yost, Jr.</u>, for
respondent.

MEMORANDUM OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following
deficiencies in petitioner's Federal income tax:

| Year | Deficiency |
| --- | --- |
| 1979 | $10,563,157 |
| 1981 | 5,163,449 |
| 1983 | 35,916,359 |

Petitioner disputes the above deficiencies and further claims to have overpaid income taxes for 1979, 1981, and 1983 by at least $25,082,591, $6,881,055, and $14,137,211, respectively.

After concessions, there are three issues for decision in this case. Each issue is the subject of a separate opinion. The issue that is the subject of this opinion involves the deductions claimed on petitioner's returns for 1983, 1984, and 1986 for certain expenses incurred in removing the overburden at a strip mine. Specifically, the issue is whether petitioner is entitled to change the income tax treatment of the subject overburden removal expenses from the treatment applicable to development expenditures, as reported on petitioner's returns, to the treatment applicable to production costs. This issue turns on whether that change is foreclosed because it is based upon a change of method of accounting as to which petitioner had not first secured the consent of the Secretary under section 446(e). Unless stated otherwise, all section references are to the Internal Revenue Code as in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. For purposes of this opinion, the tax years in issue are 1983, 1984, and 1986.

## Background

The parties have stipulated the facts applicable to the issue considered in this opinion. During the period 1971 through 1993, petitioner was the common parent of an affiliated group of corporations that included Cordero Mining Co. or one of its predecessors, Sunedco Coal Co. and Sunoco Energy Development Co. When we use the term "Cordero" in this opinion, we mean Cordero Mining Co. and its predecessors. For each of the years in issue, Cordero was a member of petitioner's affiliated group of corporations and was included in the consolidated return filed by petitioner on behalf of the group. At the time the instant petition was filed on its behalf, petitioner's principal place of business was in Philadelphia, Pennsylvania.

Before 1971, Cordero engaged in coal mining in the Powder River Basin in Wyoming. In 1971, Cordero acquired a working interest in a Federal lease of 6,560 acres of land near Gillette, Wyoming, that contained approximately 500 million tons of coal reserves. We sometimes refer to this property as the Gillette mine or the Gillette property.

In 1976, Cordero began mining the property for coal, and it continued mining the property until June 1993 when petitioner sold Cordero to Kennecott Coal Co. (Kennecott), as described below.

Cordero began mining the Gillette property by making a "box cut" in the ground to expose the coal seam. The term "box cut" describes the vertical and lateral removal of "overburden" to gain initial access to the coal. The term "overburden" refers to the soil and rock that overlay a coal seam.

After making the box cut on the Gillette property, Cordero began strip mining coal. This type of mining involves the systematic advance removal of overburden to expose the coal seam and to permit continuous extraction of the exposed mineral. The parties agree that the removal of overburden in this case benefited only the limited increment of the coal seam that was exposed after the overburden was removed. Following its removal, the stripped overburden was either deposited as part of reclaiming the disturbed or mined areas, or it was stored for later use in reclaiming those areas.

Cordero employed trucks and shovels at the Gillette mine to remove the overburden and to strip mine the exposed coal. The expenses that Cordero incurred in removing overburden and extracting coal at the Gillette mine included the salaries and wages paid to employees who operated the equipment, depreciation on and repairs to the equipment, fuel for the equipment, utilities, and employee benefits.

Cordero quantified its overburden removal costs at the Gillette mine using a volumetric ratio method. Cordero first determined the volume of overburden that was removed during the year, and it computed the ratio of that amount to the sum of the volumes of overburden removed and coal extracted. Cordero then multiplied the ratio by the total of each category of expense incurred in the process of removing overburden and extracting coal (viz, wages and benefits, fuel, utilities, depreciation, and repairs). The product of each of these multiplications was deemed to be the portion of each expense category that was attributable to the overburden removed during the year. Using this method, Cordero computed its aggregate overburden removal costs at the Gillette mine for the years in issue. These aggregate amounts are as follows:

| Year | Amount |
|------|--------|
| 1983 | [1]$13,743,557 |
| 1983 | [1]3,456,699 |
| 1984 | 19,071,400 |
| 1985 | 17,756,308 |
| 1986 | 10,452,801 |

[1] During 1983, Cordero's coal mining operations were transferred from one member of petitioner's affiliated group to another.  This amount is the aggregate overburden removal cost incurred by one member of petitioner's affiliated group of corporations during 1983.

For financial accounting purposes, beginning in 1976 and continuing through the last year in issue, petitioner treated the costs incurred for overburden removal at the Gillette mine as associated with the coal extracted during the year, and petitioner included those costs in its cost of goods sold.  Before December 1983, Cordero added all of its overburden removal costs to its costs of goods sold as the overburden removal costs were incurred.

In December 1983, Cordero changed its financial accounting treatment of overburden removal costs in order to defer the portion of those costs that is attributable to exposed but unmined coal.  Beginning in that month, the costs of removing overburden, determined using the volumetric ratio method described above, were booked as additions to a general ledger account entitled: "Preproduction Overburden Removal--Year to Date Change." As coal was produced, the overburden removal costs

attributable to the volume of coal produced were booked as reductions to the account and were "expensed" as production costs through the cost of goods sold. The net change to the account for the month, the difference between the total additions and reductions to the account, represented the net change in the overburden removal costs associated with exposed but unmined coal.

Thus, in keeping its books, petitioner treated the overburden removal costs incurred at the Gillette mine as costs that were incurred to maintain current production of the coal, and petitioner included those costs in its cost of goods sold. Petitioner did not treat them as costs related to future coal production, such as development costs, which are capitalized. See generally Fixed, Financial Reporting in the Extractive Industries, Accounting Research Study No. 11 at 49-57 (1969); FASB Discussion Memorandum, Financial Accounting and Reporting in the Extractive Industries 45-58 (Dec. 23, 1976). Furthermore, in December 1983, petitioner created a general ledger account, Preproduction Overburden Removal--Year to Date Change, that quantified the amount of the overburden removal costs attributable to exposed but unmined coal for purposes of deferring those expenses until the related coal was extracted and sold.

The record of this case contains the separate Federal income tax returns of Cordero that were included with, and incorporated in, petitioner's consolidated Federal income tax returns for taxable years 1982 through 1986. On each of those returns, Cordero stated that it used the accrual method of accounting. On its separate returns for 1982, 1983, 1984, and 1985, Cordero reported the costs incurred in removing overburden at the Gillette mine as part of the deductions claimed for salaries and wages, repairs, depreciation, employee benefit programs, and "other deductions", without identifying the portion of the deduction that was incurred for the removal of overburden. Similarly, on its separate return for 1986, Cordero included its overburden removal costs in cost of goods sold without identifying the portion thereof that was incurred for the removal of overburden.

Thus, for tax reporting purposes, Cordero treated overburden removal costs as deductions on its returns for 1982 through and including 1985, and it treated them as an offset of gross income on its return for 1986. Furthermore, Cordero reported the overburden removal costs at the Gillette mine as the costs were incurred, except for the portion of those costs allocated to ending inventory. Cordero did not defer for tax reporting purposes the

portion of those costs attributable to exposed but unmined coal, as it did for financial accounting purposes. The aggregate of the deductions claimed on each of Cordero's separate returns for the removal of overburden at the Gillette mine was equal to the amount added for the year to the general ledger account described above, Preproduction Overburden Removal--Year to Date Change, except for the amount allocated to ending inventory.

Each of Cordero's separate returns for 1983 through 1986 includes an adjustment that has the effect of capitalizing a portion of the subject overburden removal costs as would be required under section 291(b)(1), assuming that the total overburden removal costs incurred during the year at the Gillette mine were mine development expenditures that are otherwise deductible under section 616(a). The adjustment reported on Cordero's separate return for the first part of 1983 consists of a "miscellaneous" reduction of the "other deductions" claimed on line 26 of the return. The adjustments reported on Cordero's returns for the second part of 1983 and for 1984, 1985, and 1986 consist of reductions to Cordero's cost of goods sold and are labeled "mine development costs".

The following schedule shows the aggregate income offsets or deductions claimed on each of Cordero's separate returns that Cordero treated as mine development expenditures (column 2), and the portion thereof that was capitalized (column 3), pursuant to section 291(b)(1):

| Year | Total develop- ment costs | Total amount capitalized | Overburden removal costs | Amount capitalized |
|------|---------------------------|--------------------------|--------------------------|--------------------|
| 1983 | $16,871,299 | $2,530,695 | $13,743,557 | $2,061,534 |
| 1983 | 3,456,699 | 518,505 | 3,456,699 | 518,505 |
| 1984 | 21,521,593 | [1] 4,304,319 | 19,071,400 | [1] 3,814,280 |
| 1985 | [2] 18,033,139 | [3] 3,606,278 | 17,756,308 | 3,551,262 |
| 1986 | 10,714,828 | 2,142,966 | 10,452,801 | 2,090,560 |

[1] Cordero capitalized 20 rather than 15 percent, the statutory rate, and as a result overstated the total amount capitalized by $1,076,080.
[2] The parties agree that this amount is overstated by $16,760.
[3] The parties agree that this amount is overstated by $3,002.

Column 4 of the above schedule, entitled "Overburden removal costs", shows the amounts of overburden removal costs that were incurred at the Gillette mine and were treated by Cordero as mine development expenditures. These amounts form the bulk of Cordero's total development costs set out in column 2. Column 5 of the above schedule, entitled "Amount capitalized", shows the portion of each amount in column 4 that was capitalized, pursuant to section 291(b)(1). These amounts form the bulk of the total amount capitalized set out in column 3.

Generally, Cordero amortized the total amount capitalized (column 3) for each of the years in issue

over 5 years beginning with the year the costs were paid or incurred, as permitted by section 291(b)(2)(B)(i), and through 1985 it included that amount in "qualified investment" (within the meaning of section 46(c)) for purposes of computing investment credit, as permitted by section 291(b)(2)(B)(ii). Cordero also took the total amount capitalized for each year into account in computing the adjustment set forth on Schedule M-1, Reconciliation of Income Per Books with Income Per Return, for "expenses recorded on books this year not deducted on this return".

As noted above, Cordero mistakenly capitalized 20 percent of the mine development expenses reported for 1984, rather than 15 percent, the statutory rate then in effect under section 291(b)(1). The parties agree that petitioner is entitled to increase the aggregate deduction claimed in 1984 by the excess amount capitalized, $1,076,080, as long as petitioner also makes appropriate correlative adjustments to petitioner's reported investment tax credit for 1984 and to its reported amortization for 1984 through 1988.

For each of the taxable years 1987 through 1990, Cordero treated all of its overburden removal costs at the Gillette mine as mine development costs, subject to section 291(b). For each of those years, Cordero capitalized 30

percent of the amount allowable as a deduction under section 616(a), as required by section 291(b)(1), and it amortized that amount over 60 months beginning with the month in which the costs were paid or incurred, as permitted by section 291(b)(2) as in effect during 1987 through 1990. For alternative minimum tax purposes, Cordero also treated overburden removal costs as mine development costs, and Cordero took advantage of the adjustments permitted under section 56(a)(2) under which a taxpayer's taxable income for the taxable year is adjusted for purposes of computing alternative minimum taxable income by capitalizing the amount allowable as a deduction under section 616(a) (determined without regard to section 291(b)) and amortizing that amount ratably over the 10-year period beginning with the taxable year in which the expenditures were made.

For each of the taxable years 1991 through 1993, Cordero elected under section 59(e) to amortize all of its mine development costs. In accordance with this election, Cordero capitalized all of its mine development expenses and amortized those costs over 10 years. Cordero's election under section 59(e) covered overburden removal costs of $17,129,007 that were paid or incurred in 1991, overburden removal costs of $19,799,530 that were paid

or incurred in 1992, and overburden removal costs of $7,901,682 that were paid or incurred in 1993.

On June 4, 1993, petitioner sold Cordero to Kennecott. A joint election was made under section 338(h)(10) to treat the stock sale as a sale of assets. Cordero claimed unamortized mine development costs of $41,254,283 as part of the basis in the assets sold to Kennecott, including $41,185,210 of unamortized overburden removal costs.

## Discussion

### Factual and Legal Background

Generally, for Federal income tax purposes, there are at least two ways for a mining business to treat the costs of removing overburden during the producing stage of a mine or other natural deposit located in the United States. One way is to treat them as costs of producing the ore or mineral and to include them in the taxpayer's cost of goods sold. See sec. 1.61-3(a), Income Tax Regs. Under this approach, the overburden removal costs, in effect, are taken into account in computing gross income, as offsets of sales. See id. Another way is to treat them as development expenditures that are currently deductible under section 616(a), or at the election of the taxpayer, ratably deductible as deferred expenses under section 616(b). Under this second way, the overburden removal

costs would be deducted from gross income in computing the taxpayer's taxable income.  See sec. 616(a).

Section 616(a) and (b) provides as follows:

> SEC. 616(a).  In General.--Except as provided in subsection (b), there shall be allowed as a deduction in computing taxable income all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed.  This section shall not apply to expenditures for the acquisition or improvement of property of a character which is subject to the allowance for depreciation provided in section 167, but allowances for depreciation shall be considered, for purposes of this section, as expenditures.
>
> (b) Election of Taxpayer.--At the election of the taxpayer, made in accordance with regulations prescribed by the Secretary, expenditures described in subsection (a) paid or incurred during the taxable year shall be treated as deferred expenses and shall be deductible on a ratable basis as the units of produced ores or minerals benefited by such expenditures are sold. In the case of such expenditures paid or incurred during the development stage of the mine or deposit, the election shall apply only with respect to the excess of such expenditures during the taxable year over the net receipts during the taxable year from the ores or minerals produced from such mine or deposit.  The election under this subsection, if made, must be for the total amount of such expenditures, or the total amount of such excess, as the case may be, with respect to the mine or deposit, and shall be binding for such taxable year.

The applicable treatment of overburden removal costs, either as development costs or as production costs,

depends upon the circumstances of each case. The term "development", as used in section 616(a), is not defined by the Code or the regulations. Nevertheless, in distinguishing development expenditures, which are deductible under section 616, from production costs, which offset gross sales, it is generally understood that development expenditures are expenditures benefiting an entire mineral deposit or a large area of a mineral deposit, such that they provide benefits that extend over relatively long periods of extraction of the valuable ore or mineral. See Rev. Rul. 86-83, 1986-1 C.B. 251; Rev. Rul. 77-308, 1977-2 C.B. 208; Rev. Rul. 67-169, 1967-1 C.B. 159. For Federal income tax purposes, development expenditures would be treated as capital expenditures but for the provisions of section 616. See Rev. Rul. 67-169, supra. Production costs, on the other hand, are costs that are directly related to the mining of a particular increment of the mineral or ore deposit and to no other. See id.

Typically, the costs incurred in removing overburden in connection with an open pit mine, as opposed to a strip mine, are treated as development expenditures because removal of the overburden in that case not only facilitates

mining the first layer of ore, but it also allows eventual access to lower layers of ore.  See Rev. Rul. 86-83, supra.  On the other hand, the costs incurred in removing overburden in connection with a strip mine typically are integrally related to extraction of a limited area of the ore or mineral to be mined and, for that reason, are included among the costs of producing a particular increment of the ore or mineral.  See Rev. Rul. 77-308, supra; Rev. Rul. 67-169, supra.

Before 1983, development expenditures could be deducted under section 616(a) without limitation.  Beginning in 1983, the current deduction of development expenditures under section 616(a) in the case of a corporation became subject to the special rules of section 291(b).  As first enacted, section 291(b) provided in pertinent part as follows:

> SEC. 291(b).  Special Rules for Treatment of Intangible Drilling Costs and Mineral Exploration and Development Costs.--For purposes of this subtitle, in the case of a corporation--
>
>> (1) In general.--The amount allowable as a deduction for any taxable year (determined without regard to this section)--
>>
>>    *   *   *   *   *   *   *
>>
>>> (B) under section 616(a) or 617, shall be reduced by 15 percent.

(2) Special rule for amounts not allowable as deductions under paragraph (1).--

* * * * * * *

(B) Mineral exploration and development costs.--In the case of any amount not allowable as a deduction under section 616(a) or 617 for any taxable year by reason of paragraph (1)--

(i) the applicable percentage of the amount not so allowable as a deduction shall be allowable as a deduction for the taxable year in which the costs are paid or incurred and in each of the 4 succeeding taxable years, and

(ii) in the case of a deposit located in the United States, such costs shall be treated, for purposes of determining the amount of the credit allowable under section 38 for the taxable year in which paid or incurred, as qualified investment (within the meaning of subsections (c) and (d) of section 46) with respect to property placed in service during such year.

(3) Applicable percentage.--For purposes of paragraph (2)(B), the term "applicable percentage" means the percentage determined in accordance with the following table:

| Taxable Year: | Applicable Percentage: |
|---|---|
| 1.................................. | 15 |
| 2.................................. | 22 |
| 3.................................. | 21 |
| 4.................................. | 21 |
| 5.................................. | 21 |

Under this provision, the amount that otherwise would be deductible for the current year under section 616(a) is reduced by a certain percentage. Sec. 291(b)(1)(B). The percentage changed over the years. It was 15 percent for taxable years 1983 and 1984, 20 percent for taxable years 1985 and 1986, and 30 percent for taxable years 1987 through 1990.

Under section 291(b), as quoted above, the amount of the reduction is, in effect, capitalized and amortized over 5 years beginning with the year in which the expenditures were paid or incurred. See sec. 291(b)(2)(B)(i). In the case of a mineral deposit located in the United States, the amount of the reduction is also treated as qualified investment for purposes of the investment tax credit. See sec. 291(b)(2)(B)(ii). Section 291(b) became effective for tax years beginning after 1982. Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 204(a), 96 Stat. 423.

On each of Cordero's returns for 1983, 1984, 1985, and 1986, petitioner, in effect, treated the overburden removal costs incurred at the Gillette mine as "development expenditures" within the meaning of section 616(a), in that petitioner capitalized and amortized over 5 years a portion of those costs, as required by section 291(b)(1)(B) and

(2)(B)(i), and, through 1985, it included that amount in "qualified investment" (within the meaning of section 46(c)) for purposes of computing investment credit, as permitted by section 291(b)(2)(B)(ii). The portion of the overburden removal costs that was capitalized was also taken into account in computing a Schedule M adjustment on Cordero's separate returns for book expenses that were not deductible. This Schedule M adjustment was necessary because, as mentioned above, the overburden removal expenses were treated as production costs for book purposes and, as such, were treated as an offset to sales without reduction.

The parties have stipulated that, for tax purposes, "Cordero incorrectly classified its costs of overburden removal at its Gillette mine as a mine development expense." They agree that the subject overburden removal costs should not have been treated as development expenditures during any of the years in issue, and that the treatment of the subject costs on Cordero's separate returns included with petitioner's consolidated returns is wrong. The parties have also stipulated that "the removal of overburden in the continuous mining operation benefited only that limited increment of the coal seam exposed after removal of the overburden." Accordingly, they agree that

the subject overburden removal costs should have been treated as production costs. As such, these costs should have been included in petitioner's cost of goods sold and should have offset gross income from sales, see sec. 1.61-3(a), Income Tax Regs., and no part of those costs should have been capitalized and amortized.

Significantly, this is the manner in which petitioner treated the subject overburden removal costs for financial accounting purposes, as described above. From 1976, when mining on the Gillette property started, until 1993 when petitioner sold Cordero, Cordero consistently treated the overburden removal costs incurred at the Gillette mine on its books as a cost of producing the coal, and it included those costs in Cordero's cost of goods sold.

In these proceedings, petitioner seeks to treat the subject overburden removal costs incurred at the Gillette mine during 1983, 1984, and 1986 as production costs on its tax returns for those years. If petitioner were permitted to do so, the subject overburden removal costs would be treated as increases of petitioner's cost of goods sold for the year in which the costs were incurred, and no part of such costs would be subject to capitalization under sections 291(b)(1)(B) and (2)(B)(i), or included in qualified investment for purposes of computing investment

credit pursuant to section 291(b)(2)(B)(ii).  In effect, petitioner now wants to change the manner in which the overburden removal costs incurred at the Gillette mine are treated for tax purposes; and beginning with its return for 1983, petitioner wants to bring its tax accounting for overburden removal costs at the Gillette mine into conformity with its book accounting for those costs.

The Issue for Decision

The parties disagree about whether petitioner is entitled to change the treatment of Cordero's overburden removal costs on its returns for 1983, 1984, and 1986 from development expenditures to production costs.  Respondent asserts that the change is a change of accounting method and that petitioner is foreclosed from making the change by reason of the fact that petitioner failed to secure the consent of the Secretary under section 446(e).  Therefore, the issue is whether changing the treatment of Cordero's overburden removal costs on petitioner's returns for 1983, 1984, and 1986 from development expenditures to production costs is subject to the consent requirement of section 446(e).

<u>Petitioner's Position</u>

Petitioner's position is that it is not required to obtain the consent of the Secretary under section 446(e) as a prerequisite to making this change. In support of that position, petitioner makes two arguments. First, petitioner argues the change that it seeks to make is not a change of method of accounting for purposes of section 446(e). Rather, according to petitioner, it is a recharacterization of the expenses from development expenditures to production costs. Second, petitioner argues, even if the change in its tax reporting of overburden removal costs is a change of accounting method, petitioner can still make the change without the Secretary's consent. According to petitioner, there is no need for the application of section 446(e) or section 481 in this case because correcting the treatment of overburden removal costs would not distort petitioner's income.

In support of its first argument, petitioner explains that the mistake in its reporting of the overburden removal costs at the Gillette mine resulted from its mischaracterization of the mining method that Cordero employed at the mine. According to petitioner, it had incorrectly viewed Cordero's mining method as open pit mining, rather than strip mining and, as a consequence, it had incorrectly

reported the subject overburden removal costs on its returns for 1983 through 1986 as mine development costs, rather than as production costs.  Petitioner states that mischaracterizing Cordero's mining method "resulted in Petitioner's misposting of Cordero's overburden removal costs as mine development."

Petitioner argues that it is now required to correct that mistake on each of those returns and it must recharacterize the subject expenses from mine development costs to production costs.  Petitioner notes that the tax treatment of the subject expenses follows from their characterization and petitioner has no choice about the tax treatment of those expenses once they are properly recharacterized.

Petitioner asserts that, for tax purposes, the effect of having treated the subject overburden removal costs as mine development expenditures is that a portion of the aggregate expense for the year was capitalized, as required by section 291(b), and the remainder was deducted under section 616(a).  Petitioner argues that it is only the treatment of the amount capitalized that it is seeking to change.  Petitioner reasons that most of the overburden removal costs for the year were reported in the same manner as production costs.  As petitioner states:  "petitioner

treated all of Cordero's overburden removal costs <u>as</u> <u>production costs</u> on its federal income tax returns, except for the amount capitalized due to the mischaracterization." (Emphasis supplied.)

Petitioner argues that it is not attempting to change its method of accounting for production costs or its method of accounting for mine development costs, nor is it attempting to change the treatment of a material item. According to petitioner, adjusting a deduction, as it proposes to do in this case, does not involve a change in method of accounting, such that the taxpayer is required by section 446(e) to obtain the consent of the Secretary, because the change does not "[involve] the proper time for the * * * taking of a deduction." See sec. 1.446-1(e)(2)(ii), Income Tax Regs. Petitioner argues that correcting its mischaracterization of overburden removal expenses in this case, where petitioner has no choice in how to report the item for tax purposes, "involves a matter of characterization not a matter of timing as defined in the regulations." Thus, petitioner argues, the change in this case does not involve a change in method of account- ing. Petitioner asserts that there is a difference between characterizing an item for tax purposes and accounting for it. Petitioner argues that it "should be permitted to

recharacterize its overburden removal as production costs consistent with its treatment of other production costs."

As support for its first argument, that the proposed change is not a change of accounting method, petitioner principally relies upon Standard Oil Co. (Indiana) v. Commissioner, 77 T.C. 349 (1981), which it argues "governs" the case. Petitioner also cites Underhill v. Commissioner, 45 T.C. 489 (1966), Tex. Instruments, Inc., & Consol. Subs. v. Commissioner, T.C. Memo. 1992-306, and Coulter Elecs., Inc. v. Commissioner, T.C. Memo. 1990-186, affd. without published opinion 943 F.2d 1318 (11th Cir. 1991). According to petitioner, the central lesson of Standard Oil Co. (Indiana) is that "correcting improperly characterized costs is not a change in method of accounting if the taxpayer already accounts for similar items on its tax return". Petitioner argues that, in this case, because it accounts for its other production costs and the noncapitalized portion of overburden removal as production costs, there is no change in method of accounting when it correctly characterizes overburden removal to eliminate the erroneous capitalization.

In support of petitioner's second argument, that there is no need for the application of section 446(e) or 481, petitioner argues that there is no potential for distortion

in this case because the first year at issue, 1983, is the first year that the tax treatment of overburden removal costs differed from that of production costs. Petitioner asserts that the periods of limitations for all affected years are still open. Petitioner argues: "if the correction can be made in the first year of the change, there will be no distortion of income, which is the policy reason for the consent requirement of sec. 446(e)." Furthermore, petitioner notes that respondent has not identified a distortion of income that would be brought about by the change. In fact, according to petitioner, the change would actually achieve the clear reflection of petitioner's income "by reversing the erroneous capitalization of overburden removal costs" and relating those costs to the income realized from the coal produced, as contemplated by Rev. Rul. 77-308, supra, and Rev. Rul. 67-169, supra. Furthermore, petitioner argues: "treating Cordero's overburden removal expenses as production costs on its Federal income tax returns would be consistent with Cordero's treatment of overburden removal expenses on its books and records."

Respondent's Position

Respondent's position is that petitioner cannot change the treatment of the subject overburden removal costs on

its returns for 1983, 1984, and 1986 because that change is a change of accounting method for which petitioner did not obtain the consent of the Secretary, as required by section 446(e). Respondent notes that beginning in 1983 and continuing until 1993 when petitioner sold Cordero, a period of approximately 11 years, petitioner consistently accounted for all of its overburden removal costs at the Gillette mine as mine development costs within the meaning of section 616(a), and it capitalized and amortized a portion of those costs, as required initially by section 291(b) and later by section 59(e). Respondent acknowledges that the subject overburden removal costs should have been treated as production costs, but, respondent asserts, the proposed change constitutes an impermissible retroactive change in a method of accounting in contravention of section 446(e). According to respondent, the fact that petitioner's tax accounting method is erroneous does not justify petitioner's abandonment of this longstanding method of accounting for such costs without the consent of the Secretary required by section 446(e).

Respondent acknowledges that the prior consent requirement of section 446(e) applies only if the change constitutes a change in method of accounting. Respondent argues that the change which petitioner proposes to make in

this case involves a change in the treatment of a material item; that is, "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction." Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs. According to respondent, in determining whether an accounting practice for an item involves timing, "the relevant question is whether the practice permanently changes the taxpayer's lifetime income."

Respondent argues that the change in petitioner's treatment of Cordero's overburden removal costs involves timing. The change is from development costs that are deductible under section 616(a) but subject to partial capitalization and amortization under section 291(b), to production costs that can be offset against income without limitation. Respondent argues that this change affects the tax years in which the deductions are reported over the life of the mine and does not affect petitioner's lifetime income. Therefore, respondent argues, the change involves a material item under section 1.446-1(e)(2)(ii)(a), Income Tax Regs., and is a change of accounting method because the effect of the change would be to alter the timing of deductions for overburden removal costs.

Respondent argues that the change goes beyond a mere correction of a posting error or an attempt to remedy

internal inconsistencies, as was involved in <u>Standard Oil
Co. (Indiana) v. Commissioner</u>, <u>supra</u>.  Respondent
distinguishes <u>Standard Oil Co. (Indiana)</u> on the ground
that in this case "petitioner treated <u>all</u> of Cordero's
overburden removal costs as mine development expenses
deductible under I.R.C. § 616(a) for purposes of applying
the provisions of § 291(b)", not just the amount
capitalized.  In effect, respondent argues that the
overburden removal costs in this case were not treated
inconsistently.  As an example, respondent notes that for
the first part of 1983, Cordero calculated overburden
removal costs of $13,743,557 and capitalized and amortized
15 percent of that amount, or $2,061,534, as required by
section 291(b).  Respondent notes:  "If petitioner had
treated any portion of Cordero's overburden costs as
production costs, then the applicable percentage rate
specified in section 291 would not have been applied
against that portion, and a smaller amount of overburden
removal costs would have been capitalized and amortized
each year."

## Application of Section 446 to a Member of an Affiliated Group of Corporations

In the case of an affiliated group of corporations,
such as petitioner and the members of its affiliated group,

the separate taxable income of each member of the group is computed, with certain modifications, in accordance with the provisions of the Code covering the determination of taxable income of separate corporations. Sec. 1.1502-12(d), Income Tax Regs. Furthermore, the method of accounting to be used by each member of the group is determined in accordance with the provisions of section 446, as if each member filed a separate return. Sec. 1.1502-17(a), Income Tax Regs. Thus, each member of an affiliated group of corporations determines its method of accounting on a separate-company basis, and section 446 controls the determination of that member's method of accounting. See General Motors Corp. & Subs. v. Commissioner, 112 T.C. 270, 298-299 (1999). Accordingly, in order to resolve the issue in this case, whether petitioner can change the manner in which the overburden removal expenses of one of the members of its affiliated group of corporations, Cordero, were reported on petitioner's returns for 1983, 1984, and 1986, we look to Cordero's method of accounting on a separate-company basis, and we apply section 446 to Cordero as we would to a separate corporation.

The Conformity Rule of Section 446(a)

The provisions of section 446 spell out the relation-ship between a taxpayer's method of accounting for book purposes and the manner of computing the taxpayer's taxable income for tax purposes. The general rule for methods of accounting, set out in subsection (a), requires a taxpayer to compute taxable income "under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Sec. 446(a). The phrase "income in keeping his books" used in section 446(a) and (e) refers to net income computed for financial accounting purposes, in accordance with the generally accepted accounting principles in a particular trade or business applied consistently from year to year. See sec. 1.446-1(a)(2), Income Tax Regs. Thus, subsection (a) of section 446 requires the taxpayer's method of computing taxable income to conform to the taxpayer's method of accounting for book purposes. We sometimes refer to this general rule as the conformity requirement.

Courts have consistently held that the conformity rule of section 446(a) is not an absolute requirement and that tax accounting requirements may diverge from financial accounting standards. See, e.g., FPL Group, Inc. & Subs. v. Commissioner, 115 T.C. 554, 562-563 (2000); US

Freightways Corp. & Subs. v. Commissioner, 113 T.C. 329, 332 (1999), revd. on other grounds and remanded 270 F.3d 1137 (7th Cir. 2001); Public Serv. Co. v. Commissioner, 78 T.C. 445, 452-453 (1982); Geometric Stamping Co. v. Commissioner, 26 T.C. 301, 305-306 (1956); Fidelity Associates, Inc. v. Commissioner, T.C. Memo. 1992-142. As observed by this and other courts, the objectives of financial and tax accounting are "vastly different". E.g., Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 541 (1979); Public Serv. Co. v. Commissioner, supra; see also United States v. Hughes Properties, Inc., 476 U.S. 593, 603 (1986). The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and other interested persons, and it is biased toward understating the net income and assets of an enterprise. See United States v. Hughes Properties, Inc., supra; Thor Power Tool Co. v. Commissioner, supra. On the other hand, the primary goal of tax accounting is the equitable collection of revenue and the protection of the public fisc. See United States v. Hughes Properties, Inc., supra; Thor Power Tool Co. v. Commissioner, supra. As the Supreme Court has noted: "Given this diversity, even contrariety, of objectives, any presumptive equivalency between tax and financial accounting would be

unacceptable." Thor Power Tool Co. v. Commissioner, supra at 542-543.

Furthermore, it is often difficult to find that a taxpayer's return is not in conformity with the taxpayer's books. A taxpayer's books often contain sufficient records and data to permit a reconciliation of any differences between a taxpayer's return and its books. See Patchen v. Commissioner, 258 F.2d 544, 550 (5th Cir. 1958), revg. in part on another ground and affg. in part 27 T.C. 592 (1956); Public Serv. Co. v. Commissioner, supra at 452; St. Luke's Hosp., Inc. v. Commissioner, 35 T.C. 236, 247 (1960). According to the regulations promulgated under section 446, such a reconciliation of differences between the taxpayer's books and his return form a part of the taxpayer's accounting records. See sec. 1.446-1(a)(4), Income Tax Regs.; see also Rev. Rul. 74-383, 1974-2 C.B. 146.

Subsection (b) of section 446 sets forth statutory exceptions to the conformity requirement. Under that subsection, if the taxpayer does not regularly use a method of accounting, or if the method used does not clearly reflect income, then "the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." Sec. 446(b).

Thus, subsection (b) expressly limits the general rule requiring conformity to cases where the taxpayer uses a method of accounting for book purposes and where that method of accounting clearly reflects income.  Id.

The Code and the regulations vest the Commissioner with wide discretion in exercising authority under section 446(b).  See, e.g., Thor Power Tool Co. v. Commissioner, supra at 532; Brown v. Helvering, 291 U.S. 193, 203-204 (1934); Ford Motor Co. v. Commissioner, 102 T.C. 87, 91 (1994), affd. 71 F.3d 209 (6th Cir. 1995); So. Pac. Transp. Co. v. Commissioner, 75 T.C. 497, 681 (1980), supplemented by 82 T.C. 122 (1984).  As noted by the Supreme Court, it is not within the province of the courts "to weigh and determine the relative merits of systems of accounting."  Brown v. Helvering, supra at 204-205.  In view of the wide latitude given to determinations of the Commissioner under section 446, the Commissioner's interpretation of the clear-reflection standard of section 446(b) cannot be set aside unless it is "clearly unlawful".  See, e.g., Thor Power Tool Co. v. Commissioner, supra at 532; Ford Motor Co. v. Commissioner, supra at 91; Capital Fed. Sav. & Loan Association & Subs. v. Commissioner, 96 T.C. 204, 213 (1991); Prabel v. Commissioner, 91 T.C. 1101, 1111-1113 (1988), affd. 882 F.2d 820 (3d Cir. 1989).

Furthermore, in view of the Commissioner's authority to determine whether a method of accounting clearly reflects income, the method of accounting used by a taxpayer for book purposes is not binding on the Commissioner, even if it is in accord with Generally Accepted Accounting Principles.  See, e.g., Thor Power Tool Co. v. Commissioner, supra at 540-543; Am. Auto. Association v. United States, 367 U.S. 687, 692-693 (1961); Old Colony R. Co. v. Commissioner, 284 U.S. 552, 562 (1932).  As stated by the regulations:  "no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income."  Sec. 1.446-1(a)(2), Income Tax Regs.

At the same time, however, the Commissioner's discretion under section 446(b) is not unlimited.  As we have noted in the past, the Commissioner cannot require a taxpayer to change accounting methods if the taxpayer's method of accounting clearly reflects income.  See, e.g., Prabel v. Commissioner, supra at 1112; Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 31 (1988).  Similarly, the Commissioner cannot require the taxpayer to change from one incorrect to another incorrect method.  E.g., Prabel v. Commissioner, supra at 1112; Hosp. Corp. of Am. v. Commissioner, T.C. Memo. 1996-105, affd. 348 F.3d 136 (6th Cir. 2003).

The Consent Requirement

Section 446(e), the provision at issue in this case, provides as follows:

> SEC. 446(e).  Requirement Respecting Change of Accounting Method.--Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary.

The purpose of the consent requirement imposed by section 446(e) is to require consistency in the method of accounting used for tax purposes and, thus, to prevent distortions of income, which usually accompany a change of accounting methods and which could have an adverse effect upon the revenue.  See Commissioner v. O. Liquidating Corp., 292 F.2d 225, 231 (3d Cir. 1961), revg. T.C. Memo. 1960-29; Wright Contracting Co. v. Commissioner, 36 T.C. 620, 634 (1961), affd. 316 F.2d 249 (5th Cir. 1963); Casey v. Commissioner, 38 T.C. 357, 386-387 (1962); Advertisers Exchange, Inc. v. Commissioner, 25 T.C. 1086, 1092-1093 (1956), affd. per curiam 240 F.2d 958 (2d Cir. 1957).  In part, the consent requirement is also intended to lessen the Commissioner's burden of administering the Internal Revenue Code.  See Lord v. United States, 296 F.2d 333, 335 (9th Cir. 1962); Casey v. Commissioner, supra at 386.  In a

recent case, this Court identified the following as the

policy reasons served by section 446(e):

> (1) To protect against the loss of revenues;
> (2) to prevent administrative burdens and
> inconvenience in administering the tax laws;
> and (3) to promote consistent accounting
> practice thereby securing uniformity in
> collection of the revenue.

FPL Group, Inc. & Subs. v. Commissioner, 115 T.C. at 574

(quoting Barber v. Commissioner, 64 T.C. 314, 319 (1975)).

## Section 446(e) in Operation

By requiring the taxpayer to obtain the Commissioner's

consent before changing his method of accounting, section

446(e) gives the Commissioner authority to approve or

disapprove such conforming changes prospectively.  We have

held that a logical inference to be drawn from section

446(e) is that the Commissioner also has authority to

consent to a change in a taxpayer's method of computing

taxable income that has already been made; i.e., to give

consent retroactively.  See Barber v. Commissioner, 64 T.C.

314, 319 (1975).

Generally, in order to secure the Commissioner's

consent to a change of a taxpayer's method of accounting

before 1998, the taxpayer was required to file an

application with the Commissioner on a form provided for

this purpose, Form 3115, during the taxable year in which it was deemed to have made the change.  Sec. 1.446-1(e)(3)(i), Income Tax Regs.  In effect, the filing of such an application for consent to a change in accounting method is a request for a ruling from the Commissioner. See Capital Fed. Sav. & Loan Association & Subs. v. Commissioner, 96 T.C. at 211; sec. 601.204(c), Statement of Procedural Rules.  The issuance of such a ruling is a matter within the discretion of the Commissioner.  Capital Fed. Sav. & Loan Association & Subs. v. Commissioner, supra at 212.

The Commissioner will not grant permission to change a taxpayer's method of accounting unless the taxpayer and the Commissioner agree to the prescribed terms, conditions, and adjustments under which the change will be effected, including the taxable year or years in which any adjustment necessary to prevent amounts from being duplicated or omitted is to be taken into account.  See sec. 1.446-1(e)(3)(i), Income Tax Regs.  The general terms and conditions under which the Commissioner will consent to a change of accounting method are set forth from time to time in revenue procedures.  The revenue procedures applicable to the years in issue are Rev. Proc. 80-51, 1980-2 C.B. 818, superseded by Rev. Proc. 84-74, 1984-2 C.B. 736.

If the Commissioner does not consent to the taxpayer's request to make a conforming change in the taxpayer's method of computing taxable income, then the taxpayer is required to continue computing taxable income under the taxpayer's old method of accounting.  See, e.g., United States v. Ekberg, 291 F.2d 913, 925 (8th Cir. 1961); Schram v. United States, 118 F.2d 541, 543-544 (6th Cir. 1941); Drazen v. Commissioner, 34 T.C. 1070, 1075-1076 (1960) (and the cases cited thereat); Advertisers Exchange, Inc. v. Commissioner, supra at 1092-1093.

If the taxpayer changes the method of accounting used in computing taxable income without first requesting the Commissioner's consent, then the Commissioner would appear to have at least two choices.  First, the Commissioner could assert section 446(e) and require the taxpayer to abandon the new method of accounting and to report taxable income using the old method of accounting.  See, e.g., O. Liquidating Corp. v. Commissioner, supra; Drazen v. Commissioner, supra at 1076; Advertisers Exchange, Inc. v. Commissioner, supra at 1093.  Second, the Commissioner could accept the change of accounting method and require the taxpayer to make any adjustments which might be necessary to prevent amounts from being duplicated or omitted, sometimes called transitional adjustments.  See

Ryan v. Commissioner, 42 T.C. 386, 391 (1964); Patchen v. Commissioner, 27 T.C. at 597-598; cf. Brookshire v. Commissioner, 31 T.C. 1157, 1162-1164 (1959), affd. 273 F.2d 638 (4th Cir. 1960); Carver v. Commissioner, 10 T.C. 171, 174 (1948), affd. per curiam 173 F.2d 29 (6th Cir. 1949); Yates v. United States, 205 F. Supp. 738, 740-741 (E.D. Ky. 1962). Since the enactment of section 481, a taxpayer has been required to make such adjustments if the taxpayer's taxable income is computed using a method of accounting different from the method under which the taxpayer's income for the preceding taxable year was computed. See sec. 481(a).

In deciding whether to consent to a change of accounting method, the Commissioner is invested with wide discretion. See, e.g., Commissioner v. O. Liquidating Corp., 292 F.2d at 231; Capital Fed. Sav. & Loan Association & Subs. v. Commissioner, supra at 213; Drazen v. Commissioner, supra at 1076. In a case in which the taxpayer has requested the Commissioner's consent to change methods of accounting, the Commissioner's action in refusing to give consent is reviewed under an abuse of discretion standard. See Brown v. Helvering, 291 U.S. at 204; Schram v. United States, supra at 544; Capital Fed. Sav. & Loan Association & Sub. v. Commissioner, supra at

213; So. Pac. Transp. Co. v. Commissioner, 75 T.C. at 681. "The applicable standard is whether the accounting clearly reflects income". United States v. Ekberg, supra at 925 (opinion by Circuit Judge Blackmun). The taxpayer must show that the Commissioner acted arbitrarily upon any fair view of the facts. See Schram v. United States, supra at 543-544.

On the other hand, in a case in which the taxpayer did not first request the Commissioner's consent, such as where, as in the instant case, the taxpayer attempts in a court proceeding to retroactively alter the manner in which the taxpayer accounted for an item on his or her tax return, then there is no action of the Commissioner to review under the abuse of discretion standard. The question in such a case is whether the change constitutes a change of accounting method that is subject to section 446(e) and not whether the Commissioner's actions were arbitrary and an abuse of discretion. See So. Pac. Transp. Co. v. Commissioner, supra at 682; Wright Contracting Co. v. Commissioner, 36 T.C. at 635-636; cf. FPL Group, Inc. & Subs. v. Commissioner, 115 T.C. at 572, 575; Poorbaugh v. United States, 423 F.2d 157, 163 (3d Cir. 1970); Hackensack Water Co. v. United States, 173 Ct. Cl. 606, 352 F.2d 807 (1965). If the change constitutes a change of accounting

method that is subject to section 446(e), then the taxpayer is foreclosed from making the change by section 446(e) and the regulations promulgated thereunder without regard to whether the new method would be proper.  See So. Pac. Transp. Co. v. Commissioner, supra at 682; Wright Contracting Co. v. Commissioner, supra at 635-636.  The issue whether the change of accounting method is proper is not pertinent until after the Commissioner has refused the taxpayer's request for consent to the change.  See Brown v. Helvering, supra at 203; Wright Contracting Co. v. Commissioner, supra at 636; Advertisers Exchange, Inc., v. Commissioner, 25 T.C. at 1093.

Meaning of the Phrase "Method of Accounting"

The Code does not define the phrase "method of accounting".  We have held that the phrase includes "the consistent treatment of any recurring, material item, whether that treatment be correct or incorrect."  See Bank One Corp. v. Commissioner, 120 T.C. 174, 282 (2003); H.F. Campbell Co. v. Commissioner, 53 T.C. 439, 447 (1969), affd. 443 F.2d 965 (6th Cir. 1971).

The regulations promulgated under section 446 state: "The term 'method of accounting' includes not only the over-all method of accounting of the taxpayer but also the accounting treatment of any item."  Sec. 1.446-1(a)(1),

Income Tax Regs.  The regulations also contain the following discussion of changes of accounting method:

> A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan.  Although a method of accounting may exist under this definition without the necessity of a pattern of consistent treatment of an item, in most instances a method of accounting is not established for an item without such consistent treatment.  A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction. [Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.]

In order to determine whether an item is one "which involves the proper time for the inclusion of the item in income or the taking of a deduction" and, hence, is a material item under the above regulation, it is necessary to determine whether a change in the treatment of that item will change the taxpayer's lifetime income or will merely postpone or accelerate the reporting of income.  See, e.g., Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 510 (1989), where the Court stated:  "When an accounting practice merely postpones the reporting of income, rather than permanently avoiding the reporting of income over the taxpayer's lifetime, it involves the proper time for reporting income."  See Diebold, Inc. v. United States, 891 F.2d 1579, 1583 (Fed. Cir. 1989) (a change from

nondepreciable inventory to depreciable property is a change in method of accounting); FPL Group, Inc. v. Commissioner, 115 T.C. 554 (2000) (a change from capitalizing and depreciating the costs of a group of depreciable assets to expensing them involves a change in the treatment of a material item and is, therefore, an impermissible change in method of accounting); Pac. Enters. v. Commissioner, 101 T.C. 1 (1993) (a change from "working gas" (inventory) to "cushion gas" (capital asset) is a change in method of accounting); Standard Oil Co. (Indiana) v. Commissioner, 77 T.C. at 410 (a change in depreciation method resulting from a change from section 1250 property to section 1245 property is a change in method of accounting).

Finally, the regulations detail certain situations that are not considered changes in method of accounting. Section 1.446-1(e)(2)(ii)(b), Income Tax Regs., provides:

> A change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability (such as errors in computation of the foreign tax credit, net operating loss, percentage depletion or investment credit). Also, a change in method of accounting does not include adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a deduction. For example, corrections of items that are deducted as interest or salary, but which are in fact payments of dividends, and of items that are

deducted as business expenses, but which are in fact personal expenses, are not changes in method of accounting.  * * *  A change in the method of accounting also does not include a change in treatment resulting from a change in underlying facts. On the other hand, for example, a correction to require depreciation in lieu of a deduction for the cost of a class of depreciable assets which had been consistently treated as an expense in the year of purchase involves the question of the proper timing of an item, and is to be treated as a change in method of accounting.

## The Change That Petitioner Seeks To Make in This Case Involves a Material Item

In the present case, petitioner is not seeking to change its overall plan of accounting for gross income or deductions, such as by changing from the accrual method to some other overall method of accounting.  Rather, the change that petitioner seeks to make involves the treatment of a single item, the overburden removal costs incurred by Cordero at the Gillette mine, which forms a part of petitioner's overall plan.  We must determine whether this is a material item; that is, an "item which involves the proper time for the inclusion of the item in income or the taking of a deduction."  See sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.  If it is a material item, then a change in its treatment can involve a change in petitioner's method of accounting, and we must consider petitioner's other arguments.

On this point, we agree with respondent. As discussed above, petitioner treated the overburden removal costs incurred by Cordero at the Gillette mine as a development expenditure on its returns for the years in issue. This meant, depending on the year involved, that 80 to 85 percent of the aggregate overburden removal costs incurred during the taxable year was deducted against taxable income under section 616(a). See sec. 291(b)(1). The remainder was capitalized and was amortized over 5 years, beginning with the year in which the costs were paid or incurred. See sec. 291(b)(1) and (2). Petitioner now proposes to treat the overburden removal costs incurred during 1983, 1984, and 1986 as production costs that can fully offset gross receipts as part of petitioner's costs of goods sold.

The difference between treating overburden removal costs as a development expenditure and treating them as a production cost is summarized in the following schedule:

| Year | Development Expenditure | Production Cost | Difference |
|------|------------------------|-----------------|------------|
| 1 | [1]85.00% + 2.25% | [2]100% | (12.75%) |
| 2 | 3.30 | -- | 3.30 |
| 3 | 3.15 | -- | 3.15 |
| 4 | 3.15 | -- | 3.15 |
| 5 | 3.15 | -- | 3.15 |
| | Total    100 | 100 | -- |

[1]  80 percent for 1986.
[2]  Assuming, for simplicity's sake, that all of the coal related to the overburden removal expenditures was sold in the year the costs were incurred.

As indicated above, if overburden removal costs are treated as development expenditures, then 87.25 percent of the total would be deductible in the year incurred, and 12.75 percent of the total would be spread, as deductions, over years 2 through 5.  On the other hand, if overburden removal costs are treated as production costs, then 100 percent of the total would be included in petitioner's cost of goods sold and would offset gross receipts from the mine in the year the coal is sold.

It is apparent from the above that the change in the treatment of overburden removal costs that petitioner seeks to make entails a change in the timing of the income reported from the mine and not a change in the total income realized over the life of the mine.  Accordingly, the aggregate overburden removal costs petitioner incurred at the Gillette mine are a material item because they involve

the proper time for the taking of a deduction.  See sec.
1.446-1(e)(2)(ii)(a), Income Tax Regs.

Petitioner's Arguments Do Not Persuade Us That the Subject
Change Is Not a Change of Accounting Method

Petitioner argues that the proposed change in the
treatment of its overburden removal costs is not a change
of accounting method but only a recharacterization of the
costs from development expenditures to production costs.
In support of that argument petitioner cites four cases:
Underhill v. Commissioner, 45 T.C. 489 (1966); Coulter
Elecs., Inc. v. Commissioner, T.C. Memo. 1990-186; Standard
Oil Co. (Indiana) v. Commissioner, 77 T.C. 349 (1981); and
Tex. Instruments Inc., & Consol. Subs. v. Commissioner,
T.C. Memo. 1992-306.

We believe that the cases petitioner cites are
distinguishable.  In Underhill v. Commissioner, supra, the
Court held that a taxpayer's switch to a cost recovery
method of determining income from certain promissory notes,
after having used a pro rata method with regard to the same
notes in previous years, was not a change in method of
accounting under section 446(e).  The Court held that
section 446 was inapplicable because the issue involved
"the extent to which payments received by * * * [the
taxpayer] are taxable or nontaxable--i.e., the character

of the payment--not the proper method or time of reporting an item the character of which is not in question." Id. at 496.

Similarly, in Coulter Elecs., Inc. v. Commissioner, supra, the Court considered the character of payments received by the taxpayer from a bank. Initially, the taxpayer had treated the transfer of certain equipment leases to the bank as sales, but after audit, the taxpayer sought to change the treatment from sales to pledges for loans. Relying on Underhill, the Court found that the issue in the case was "not one of timing as contemplated by section 446" but "Instead it [was] a question of characterization, i.e., whether the transfer by * * * [the taxpayer] of the leases to * * * [the bank] constituted sales or pledges for loans." Coulter Elecs., Inc. v. Commissioner, supra. The Court quoted the Underhill case regarding the taxability or nontaxability of a payment and stated: "Although there is a timing consequence to the outcome of the characterization, it is automatically determined by the characterization and no change of accounting within the meaning of section 446 is involved." Id.

The change in characterization in Coulter Elecs., Inc. and in Underhill determined the taxability of the income

items at issue.  In each case, the character of the items was changed from taxable to nontaxable, and the taxpayer's lifetime taxable income was affected.  In each case, the Court held that the change was not a change in the taxpayer's method of accounting.

The change in characterization in the instant case, on the other hand, does not involve the same kind of recharacterization that was involved in either Underhill or Coulter Elecs., Inc.  In this case, the overburden removal costs are deductible whether they are treated as mine development expenses or production costs.  The change in characterization affects only whether the overburden removal costs are treated as an income offset or are amortized over 5 years.  This is clearly a timing issue. Petitioner's lifetime taxable income is not affected.

Petitioner refers to the following statement made by the Court in Tex. Instruments, Inc., & Consol. Subs. v. Commissioner, supra:

> We therefore conclude that, to the extent that petitioner was required to allocate those costs to its long-term contracts to comply with the regulations, respondent's proposed adjustments would not constitute a change in petitioner's method of accounting for those items within the meaning of section 1.446-1(e)(2)(ii), Income Tax Regs.

That statement was made in response to the taxpayer's argument to the effect that the Commissioner's allocation of certain general and administrative expenses, as called for in the amendment to answer, was not a change of method of accounting under Standard Oil Co. (Indiana) v. Commissioner, supra, because the taxpayer was required by the regulations to allocate those costs to long-term contracts and did not have a "discretionary choice" to do otherwise.

Other than the above statement, we find nothing in Tex. Instruments that is useful to petitioner in this case. As we read the Court's opinion in Tex. Instruments, the statement quoted above is dictum. Furthermore, the statement was made about adjustments proposed by the Commissioner, as to which section 446(e) does not apply. See Complete Fin. Corp. v. Commissioner, 80 T.C. 1062, 1073 (1983) ("The restriction of section 446(e) does not apply to changes initiated by the Commissioner."), affd. 766 F.2d 436 (10th Cir. 1985). Finally, the above statement is nothing more that a reprise of the Court's holding in Standard Oil Co. (Indiana), a case which, as discussed below, is unlike petitioner's.

Petitioner's reliance on the last case cited, Standard Oil Co. (Indiana), is also misplaced. In that case, the

taxpayer had elected to deduct intangible drilling costs
(IDC), pursuant to section 1.612-4, Income Tax Regs., but
had capitalized and amortized, over the lives of the
assets, certain IDC.  We rejected the Commissioner's
assertion that the taxpayer's attempt to deduct that IDC in
the taxable years at issue was a change in its method of
accounting that required the Commissioner's consent
because:

> If the election [to deduct IDC] is made, all
> IDC must be deducted.  Petitioner's tardy
> assertion that the "other" costs in issue should
> have been deducted does not * * * constitute a
> discretionary choice that such costs should be
> deducted.  It is a discovery that petitioner
> failed to deduct costs which, under the
> accounting method it has chosen, had to be
> deducted.  [Standard Oil Co. (Indiana) v.
> Commissioner, 77 T.C. at 382-383.]

We held that section 446(e) did not apply, but we added the
following caveat:

> We do not mean to suggest that section 446(e)
> would necessarily be inapplicable in the
> situation where a taxpayer has previously
> capitalized all IDC and then seeks to deduct
> such costs under section 263(c) without
> respondent's consent.  [Id. at 383-384.]

We believe that the change petitioner proposed is
different from the "correction of internal inconsistencies"
necessitated by the "discovery" of the taxpayer's failure

to deduct certain costs that was involved in <u>Standard Oil Co. (Indiana)</u>. First, this case does not involve "internal inconsistencies." Petitioner treated all of the overburden removal expenses incurred at the Gillette mine as development expenses for tax purposes. The parties stipulated: "Cordero incorrectly classified its costs of overburden removal at its Gillette mine as mine development expenses." Petitioner now wants to reclassify all of those costs as production costs. Furthermore, we cannot find that the change in treatment sought by petitioner was necessitated by the discovery of an error, as opposed to "a discretionary choice". All of the overburden removal expenses incurred at the Gillette mine were treated as production costs for book purposes, and the Schedule M-1, Reconciliation of Income Per Books With Income Per Return, filed with petitioner's return for each of the years in issue, reconciles that book treatment with the tax treatment of the same overburden removal expenses as development expenditures.

In summary, the instant case does not involve the kind of recharacterization that was involved in either <u>Underhill v. Commissioner</u>, 45 T.C. 489 (1966), or <u>Coulter Elecs., Inc. v. Commissioner</u>, T.C. Memo. 1990-186, and that takes into account the nontaxable character of payments that are

at issue. Neither does this case involve the correction of internal inconsistencies discovered by the taxpayer as involved in Standard Oil Co. (Indiana) v. Commissioner, 77 T.C. 349 (1981).

In light of the above, we agree with respondent that petitioner's overburden removal costs incurred at the Gillette mine are a "material item" and that the change in the treatment of that item proposed by petitioner is a change of accounting method that is subject to the consent requirement of section 446(e). Petitioner concededly did not obtain the Commissioner's consent and, therefore, petitioner is not entitled to make the change proposed.

Finally, we disagree with petitioner's second argument that, even if the change is a change of accounting method, section 446(e) does not apply because there is no potential for distortion in this case. Petitioner argues that there is no potential for distortion because the first year at issue, 1983, is the first year in which the tax treatment of overburden removal costs differed from that of production costs. This and other courts have rejected similar arguments in the past. See Diebold, Inc. v. United States, 891 F.2d at 1583; So. Pac. Transp. Co. v. Commissioner, 75 T.C. at 682; cf. Pac. Natl. Co. v. Welch, 304 U.S. 191 (1938); Lord v. United States, 296 F.2d 333,

335 (9th Cir. 1962).  As we stated in <u>So. Pac. Transp. Co. v. Commissioner</u>, <u>supra</u>, the Commissioner's consent is required when a taxpayer, in a Court proceeding, attempts to alter retroactively the manner in which he accounted for an item on his tax return.  We reject petitioner's argument because of the administrative burden that would otherwise be placed on the Commissioner.  This administrative burden is particularly evident in this case where the treatment that petitioner seeks to change had been followed consistently on its returns from 1983 through 1993 until it sold Cordero.

On the basis of the above, concessions by the parties, and our prior opinions issued in this case,

<u>An appropriate order</u>

<u>will be issued</u>.