T.C. Memo. 2015-99

UNITED STATES TAX COURT

JAMES H. HAWSE AND CYNTHIA L. HAWSE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8267-12.                          Filed May 27, 2015.

During 2002 and 2003 P-H was the sole shareholder of J, an S
corporation. J, an automotive dealership, accounted for its new and
used vehicles inventories on the LIFO method of accounting. For
2001 J sought automatic consent under a revenue procedure to change
its method of accounting for its new and used vehicles from LIFO to
specific identification, with vehicles valued at the lower of cost or
market rather than actual cost. J never fully implemented the change
as requested but thereafter filed Federal income tax returns as if it
had, reporting I.R.C. sec. 481(a) LIFO recapture income and paying
the tax thereon.

In 2009 J filed amended tax returns for 2002 and 2003 purporting
to "correct" its prior returns to reflect continued use of LIFO. Ps
contend that because J did not change its valuation method for all of
its vehicles inventory to lower of cost or market, J never received
automatic consent and therefore remained on the LIFO method. If so,
Ps reason, they are entitled to refunds of the tax paid on LIFO
recapture income for 2002 and 2003.

[*2]     Held:  J failed to satisfy the requirements for automatic consent under Rev. Proc. 99-49, 1999-2 C.B. 725, because it did not comply with all terms and conditions of the revenue procedure.

Held, further, because J consistently accounted for its new and used vehicles inventory using the specific identification method on its 2001 through 2007 income tax returns, a seven-year period, J changed its method of accounting notwithstanding its failure to secure R's consent.

Held, further, J's attempt to revert to the LIFO method of accounting by filing amended returns is a change in method of accounting that requires R's consent under I.R.C. sec. 446(e).

Steven Ray Mather, for petitioners.

Halvor R. Melom, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  Respondent determined deficiencies and section 6662(a)[1] accuracy-related penalties with respect to petitioners' 2002 and 2003 taxable years as follows:

_____

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) of 1986, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Throughout this opinion we refer to the income tax regulations in effect for the tax years at issue.

| [*3] Year | Deficiency | Penalty sec. 6662(a) |
|---|---|---|
| 2002 | $2,892,317 | $578,463.40 |
| 2003 | 1,604,752 | 320,950.40 |

After the parties' filing of a stipulation of facts, a stipulation of settled issues, and a supplemental stipulation of settled issues, which are by this reference incorporated herein, the only remaining issues for decision are:

(1) whether for 2001 and the tax years at issue JHH Motor Cars, Inc. (JHH), petitioner James H. Hawse's wholly owned S corporation, received automatic consent to change its method of accounting for its new and used vehicles inventories (vehicles inventory) from LIFO to specific identification;

(2) if not, whether JHH changed that method of accounting for the years 2001 through 2007 notwithstanding its failure to secure respondent's automatic consent; and

(3) if so, whether JHH's attempt in 2009 to revert to the LIFO method of accounting for its vehicles inventory by filing amended income tax returns for 2002 and 2003 constitutes a proposed second change in accounting method which would be permissible only with respondent's consent.

**[*4]**                        FINDINGS OF FACT

Petitioners James H. Hawse and Cynthia L. Hawse resided in California on

the date the petition was filed.[2]  At all relevant times, Mr. Hawse was the president

and sole shareholder of JHH, a subchapter S corporation.[3]

JHH was incorporated under the laws of the State of California in 1984.  Its

original name was Taylaurel Motors, Inc., which it changed to Sierra Toyota, Inc.,

in 1985 and then to JHH Motor Cars, Inc., in 2001.  During the tax years at issue

JHH sold new Toyota and Mitsubishi vehicles and used vehicles and operated a

full service automobile repair and parts department.

JHH's Method of Accounting

On September 10, 1985, JHH (under its former name Sierra Toyota, Inc.)

elected to use the last-in, first-out (LIFO) method of accounting for its vehicles

inventory.[4]  JHH made that election by filing Form 970, Application To Use LIFO

---

[2]The venue for appeal of this case is the U.S. Court of Appeals for the Ninth
Circuit both because petitioners resided within its jurisdiction when they filed
their petition, see sec. 7482(b)(1)(A), and because, in any event, the parties have
so stipulated, see sec. 7482(b)(2).

[3]Following the general rule for S corporations, see sec. 1378(b), JHH was a
calendar year taxpayer.

[4]LIFO is one of two alternative cost flow assumptions generally used for
financial accounting and tax purposes to compute a taxpayer's cost of goods sold.
                                                                    (continued...)

**[*5]** Inventory Method, with the Internal Revenue Service (IRS). JHH did not make a similar LIFO election for its parts inventory (non-LIFO inventory), which it identified using the specific identification method and valued on the basis of lower of cost or market.[5]

In early 2001, Mr. Hawse, anticipating that he might sell his dealership at some point given the interest expressed by potential buyers, sought to terminate

---

[4](...continued)
Under the other assumption, first-in, first-out (FIFO), it is assumed that the first goods acquired or produced are the first goods sold and that the goods remaining in ending inventory are the last goods acquired or produced. Under LIFO, it is assumed that the last goods acquired or produced are the first goods sold. "[T]he overriding purpose of * * * LIFO * * * is to match current costs against current income." UFE, Inc. v. Commissioner, 92 T.C. 1314, 1322 (1989).

For a taxpayer in an inflationary environment whose ending inventory, computed under LIFO, reflects the lower prices of antecedent purchases (rather than the higher prices of current purchases) and as a consequence a higher cost of goods sold, LIFO boasts an obvious advantage: a reduction in current income, leading, generally, to a reduction in current income tax. The potential for increased gain on account of the allocation of the lower costs of antecedent purchases to ending inventory is not eliminated, however; it is simply deferred until, in time, there is a liquidation of the items to which those lower costs have been allocated. See Huffman v. Commissioner, 126 T.C. 322, 324-326 (2006) (providing a detailed explanation of the LIFO method of accounting), aff'd, 518 F.3d 357 (6th Cir. 2008).

[5]An inventory identification method differs from an inventory valuation method. On Form 3115, Application for Change in Accounting Method, the taxpayer must provide information for both his present and proposed inventory identification methods (LIFO, FIFO, or specific identification) and inventory valuation methods (cost; cost or market, whichever is lower; retail cost; retail, lower of cost or market; or other).

[*6] JHH's LIFO election because he viewed the LIFO method as an impediment to the eventual sale of his business. Mr. Hawse's specific concern, as he framed it at trial, germinated from the accumulated LIFO reserve that either he or the purchaser might have to recapture if he sold the dealership.[6] Mr. Hawse felt that generally buyers prefer an asset sale to a stock purchase because they do not want to take on the potential corporate or personal income tax liability associated with an unrecaptured LIFO reserve. In the event of an asset sale, JHH would have to recapture the entire LIFO reserve and Mr. Hawse as its sole shareholder would have to pay tax on it in a single tax year. Because a taxpayer generally must obtain IRS consent to any change in its method of accounting, see sec. 446(e), JHH attempted to follow the automatic consent procedure in Rev. Proc. 97-37, 1997-2 C.B. 455.

JHH filed with the IRS an application for automatic consent to revoke its LIFO election for the vehicles inventory in favor of the specific identification method. It did so principally by attaching Form 3115 to its timely filed 2001 Form 1120S, U.S. Income Tax Return for an S Corporation. On that Form 3115 JHH

---

[6]The LIFO reserve with respect to a pool of inventory is the difference between the accounting cost of that inventory calculated using the FIFO method and the cost calculated using the LIFO method. It measures the potential built-in gain in the inventory as a result of using the LIFO method in an inflationary or rising price economy.

**[*7]** stated that it was requesting permission to change its method of accounting for its vehicles inventory pursuant to the automatic consent provisions of Rev. Proc. 97-37, supra, and that the change would take effect for tax year 2001.

JHH further stated that it currently identified its vehicles inventory using the LIFO method and valued it at cost and that going forward it would identify that inventory using the specific identification method and would value it at the lower of cost or market. Form 3115 made clear that JHH's use of the specific identification method for its non-LIFO inventory and its valuation of that inventory at the lower of cost or market would remain unchanged. The table below summarizes the information JHH presented on Form 3115:

| Inventory | Identification method used before LIFO termination | Identification method used after LIFO termination |
|---|---|---|
| Vehicles inventory | LIFO | Specific identification |
| Non-LIFO inventory | Specific identification | Specific identification |

| Inventory | Valuation method used before LIFO termination | Valuation method used after LIFO Termination |
|---|---|---|
| Vehicles inventory | Actual cost | Lower of cost or market |
| Non-LIFO inventory | Lower of cost or market | Lower of cost or market |

**[\*8]** JHH also stated on Form 3115 that it would make the necessary section 481(a) adjustment by including in income, or recapturing, its stored LIFO reserve of $1,084,437[7] over a period of four years--$271,109 per year for each of 2001, 2002, 2003, and 2004.[8] JHH did not attach a statement explaining how its proposed new methods of identifying and valuing its vehicles inventory were consistent with the requirements of section 1.472-6, Income Tax Regs., or how these methods conformed to the requirements of Rev. Proc. 97-37, app. sec. 10.01, 1997-2 C.B. at 476. Mr. Hawse, JHH's president and sole shareholder, signed Form 3115, and JHH filed a copy with the IRS National Office.

---

[7]JHH's Form 3115 shows values for the ending vehicles inventory for year 2000 computed under the old method (LIFO at cost) and the new method (specific identification at the lower of cost or market). Nothing in the record explains how the ending vehicles inventory value under the new method was calculated. JHH's accountant's generalized statements during the trial seem to indicate that the difference between the two ending inventories should be equal to the accumulated LIFO reserve, $1,084,437, that was recaptured. The difference, however, is not equal to the accumulated recaptured LIFO reserve. The record does not provide an explanation for the apparent discrepancy.

[8]In the case of a change from LIFO to some other method of accounting, sec. 481(a) requires the recapture of LIFO reserve for the year of the change and thus prevents the accumulated LIFO reserve from escaping taxation. Rev. Proc. 97-37, sec. 5.03 and 5.04(1), 1997-2 C.B. 455, 459, permits a taxpayer to recapture this LIFO reserve over a period of four years--the four-year spread. Accord Rev. Proc. 99-49, sec. 5.04(1), 1999-2 C.B. 725, 732.

**[*9]**  Consistent with its affirmations on Form 3115, on its 2001 through 2007 income tax returns JHH used the specific identification method of accounting for all of its inventory (vehicles and non-LIFO inventory).  JHH also made the section 481(a) adjustment, reporting income of $271,109 under "RECAPTURE LIFO RESERVE", on each of its 2001, 2002, 2003, and 2004 income tax returns.

However, contrary to its representation on Form 3115 that it would value all of its inventory at the lower of cost or market, JHH in fact used different valuation approaches for its various inventories.  It used actual cost for new vehicles, lower of cost or wholesale market for used vehicles, and lower of cost or market for parts.  Neither JHH's 2001 income tax return nor its Form 3115 disclosed these various approaches.  That JHH used these various inventory valuation approaches could be gleaned only from its yearend financial statements.

At no point after JHH filed Form 3115 did respondent advise JHH, in writing or otherwise, that the IRS had rejected JHH's application for automatic consent or that its application was in any way defective.

JHH's Amended Returns

During the years 2001, 2002, and 2003 Kruse Mennillo LLP (Kruse Mennillo) provided accounting services to JHH.  JHH had worked with Kruse Mennillo since 1998.  Kruse Mennillo reviewed JHH's financial statements,

**[\*10]** provided tax preparation services and inventory valuations, and worked on various other special projects that might come up during the year. With respect to inventory valuations, all inventory valuations on the operational level were done in-house by JHH personnel except that at the end of the year Kruse Mennillo would calculate the LIFO yearend inventory and determine the LIFO reserve amount on the basis of that calculation.

During the years 2001, 2002, and 2003 Victor Kawana was the managing partner of the Cerritos, California, office of Kruse Mennillo and was in charge of JHH's account. At some point before March 10, 2009, Mr. Kawana attended an online seminar, or webinar. Petitioners and Mr. Kawana contend that: (1) IRS Motor Vehicle Technical Specialist Terri Harris participated in that webinar and (2) Ms. Harris represented during the webinar that the IRS was rejecting Forms 3115 filed by taxpayers whose post-LIFO-termination methods of inventory valuation were not identical for all inventory employed in their businesses.[9]

---

[9]We do not, and need not, make any finding of fact as to whether these events occurred as petitioners and Mr. Kawana contend because the accuracy of their contentions will not affect the outcome of this case. We note, however, that Mr. Kawana does not recall the specific day, week, or month in which the webinar allegedly occurred, and no recording, transcript or other corroborative record of the webinar was offered into evidence. Moreover, Ms. Harris has attended approximately two webinars since assuming the position of IRS Motor Vehicle Technical Specialist in 2001. She credibly testified that she does not recall

(continued...)

[*11] After allegedly hearing Ms. Harris' statements during the webinar, Mr. Kawana met with Willard De Fillips, an auto dealership industry professional who advises on LIFO accounting method issues, to discuss the status of JHH's LIFO termination. From his conversation with Mr. De Fillips, Mr. Kawana understood that Mr. De Fillips considered JHH's LIFO termination problematic.

Mr. De Fillips also publishes a newsletter, "The LIFO Lookout", that addresses various issues related to LIFO inventories. Mr. Kawana's firm, Kruse Mennillo, subscribes to it. The spring 2008 edition of the LIFO Lookout addressed the validity of automatic LIFO termination applications. Specifically, Mr. De Fillips advised his readers in the LIFO Lookout that: (1) recently, the IRS National Office had been rejecting Forms 3115 that were filed for automatic terminations of LIFO elections; (2) this fact had been further confirmed by his meeting with an IRS motor vehicle technical adviser; and (3) it appeared that the IRS' position was that dealerships could not use the automatic change provisions to terminate the LIFO method if, after filing their LIFO termination applications, the dealerships did not use the same method of inventory valuation for all of their

---

[9](...continued)
attending any webinar where she discussed the subjects alleged or otherwise had any specific discussions with petitioners or their representatives concerning LIFO termination.

[*12] non-LIFO inventory.  Mr. De Fillips posited that in such a case filing amended returns might be one acceptable way of reverting to the LIFO method and correcting a defective LIFO termination.

On the basis of the foregoing information, Mr. Kawana advised Mr. Hawse that JHH should file amended returns to reinstate the LIFO method for vehicles inventory and to reverse the related section 481(a) adjustments.  On March 10, 2009, with Mr. Hawse's approval, JHH filed amended income tax returns for tax years 2002 through 2007, stating that "the amended tax returns reflect the valuation of the taxpayer's new inventory at LIFO, consistent with its prior election."  JHH did not file an amended return for 2001 because the period of limitations for that year had presumably expired.[10]  Instead, JHH included the adjustments for 2001 in its amended return for 2002.

On its amended returns for 2002 and 2003, the years at issue here, consistent with its goal of reverting to the LIFO method, JHH reversed the section 481(a) adjustment that it had earlier made, computed additional LIFO reserve amounts (LIFO "layers") for years 2001, 2002, and 2003 and claimed deductions for these additional LIFO reserve amounts on its 2002 and 2003 amended returns.

_____

[10]Years 2002 and 2003 were still open because JHH's returns for those years were under examination by the IRS and period of limitations extensions had apparently been obtained.

**[\*13]** The adjustments on JHH's 2002 and 2003 amended returns attributable to its attempted reversion to the LIFO method and the resulting disputed income adjustments are in the following amounts:

| Year | Reversal of sec. 481(a) adjustment | LIFO Reserve (LIFO Layers) | Contested reduction in income |
|---|---|---|---|
| 2002 | [1]$542,218 | [2]$32,000 | $574,218 |
| 2003 | 271,109 | 31,000 | 302,109 |

[1]On its 2002 amended return JHH deducted $542,218 for the reversal of the sec. 481(a) adjustment, $271,109 for 2001 and $271,109 for 2002.

[2]Because the original 2001 and 2002 tax returns did not use LIFO for vehicles inventory, on its 2002 amended return JHH deducted $32,000 for its approximated LIFO reserve. Of this amount, $11,000 was for 2001 and $21,000 was for 2002. The $31,000 LIFO reserve amount for 2003 was also an approximation.

JHH claimed refunds on its 2002 and 2003 amended returns as a result of these adjustments.

On January 6, 2012, respondent mailed petitioners a notice of deficiency for tax years 2002 and 2003. Petitioners timely filed a petition with this Court. The parties resolved all deficiency issues before trial, leaving only petitioners' refund claims for litigation.[11]

---

[11]In a deficiency case such as this one, sec. 6512(b)(1) grants this Court

(continued...)

[*14]                                    OPINION

As a general rule, a taxpayer's "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Sec. 446(a). If the taxpayer desires to "change[] the method of accounting on the basis of which he regularly computes his income in keeping his books", he must, "before computing his taxable income under the new method, secure the consent of the Secretary." Sec. 446(e). "Consent must be secured whether or not such method is proper or is permitted under the Internal Revenue Code or the regulations thereunder." Sec. 1.446-1(e)(2)(i), Income Tax Regs.

To secure the Commissioner's consent to an accounting method change, a taxpayer may either: (1) file a properly completed "Form 3115 with the Commissioner during the taxable year in which the taxpayer desires to make the change in method of accounting" and await an affirmative grant of consent, see id. subpara. (3)(i), or (2) comply with the terms and conditions for obtaining consent under any administrative procedures promulgated by the Commissioner for that purpose, see id. subdiv. (ii). Rev. Proc. 99-49, 1999-2 C.B. 725, provides for

---

[11](...continued)
jurisdiction to determine the amount of a taxpayer's overpayment, if any, and provides that any overpayment so determined shall be refunded to the taxpayer.

[*15] automatic consent upon compliance with its terms and conditions and embodies those administrative procedures for the tax year for which JHH attempted to terminate its LIFO election.[12]

We first consider whether JHH complied with these terms and conditions and thereby secured automatic consent.

I. Automatic Consent Under Rev. Proc. 99-49

Petitioners' threshold contention is that JHH never received automatic consent to the revocation of its LIFO election. Petitioners point to Rev. Proc. 97-37, app. sec. 10.01(1)(b)(i)(A), which they contend conditions automatic consent

---

[12]At trial and in their posttrial briefs the parties consistently referenced Rev. Proc. 97-37, supra, and framed their arguments on the basis of its provisions. That revenue procedure was superseded by Rev. Proc. 98-60, 1998-2 C.B. 759. Rev. Proc. 98-60, supra, was, by its terms, effective for tax years ending on or after December 21, 1998. Id. sec. 13.03, 1998-2 C.B. at 769. We refer to its effective date in the past tense because Rev. Proc. 98-60, supra, was itself superseded by Rev. Proc. 99-49, supra, effective for tax years ending on or after December 27, 1999, including JHH's 2001 tax year. Rev. Proc. 99-49, secs. 1, 13.02, 1999-2 C.B. at 728, 737. Rev. Proc. 99-49, supra, was later superseded by Rev. Proc. 2002-9, 2002-1 C.B. 327, effective for tax years ending on or after January 7, 2002. Rev. Proc. 2002-9, secs. 1, 13.01, 2002-1 C.B. at 334, 345.

When JHH sought to change its method of accounting for its tax year ending December 31, 2001, Rev. Proc. 99-49, supra, provided the applicable procedure for obtaining automatic consent. We will rely upon it in our analysis rather than upon the superseded procedure cited by the parties, who now agree that it, rather than Rev. Proc. 97-37, supra, exclusively governed JHH's automatic consent application. The relevant portions of the two procedures differ only minimally, and we note such differences in our analysis.

**[\*16]** on JHH's adoption, in practice, of the same inventory valuation method for all of its vehicles inventory as it used for its non-LIFO inventory. Rev. Proc. 99-49, app. sec. 10.01(1)(b)(i)(A), 1999-2 C.B. at 752, contains wording identical to that cited by petitioners. Compare Rev. Proc. 97-37, 1997-2 C.B. at 476, with Rev. Proc. 99-49, 1999-2 C.B. at 752.

As we found, for 2001 and subsequent years JHH did not use the same valuation method for all of its vehicles and non-LIFO inventory. In petitioners' view, a taxpayer must actually follow through on its representations on Form 3115 for automatic consent to be granted. Consequently, they reason, JHH's application was fatally defective, and JHH retained its historic LIFO method during the tax years at issue.

In respondent's view, a taxpayer need only comply with the applicable revenue procedure's requirements in filing Form 3115 to obtain automatic consent; for the consent to be effective, the taxpayer need not, as a factual matter, implement the changes requested on the form. Respondent asserts that JHH complied with all relevant provisions of Rev. Proc. 97-37, supra, and that as a result, consent was automatically granted.

To resolve this dispute, we must identify the terms and conditions of Rev. Proc. 99-49, supra, and then determine whether JHH met them.

**[*17]** A.    <u>What the Revenue Procedure Said</u>

As with any question of textual interpretation, the starting point for our analysis must be the text itself.  <u>See, e.g.</u>, <u>Ford Motor Co. v. United States</u>, 768 F.3d 580, 591-593 (6th Cir. 2014) (assessing parties' competing interpretations of a revenue procedure, on the basis of its specific wording, before considering their consistency with its general policy and structure); <u>Dillon, Read & Co., Inc. v. United States</u>, 875 F.2d 293, 298 (Fed. Cir. 1989) (examining wording of revenue procedure and interpreting it by applying maxim of statutory construction); <u>see also</u> <u>Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.</u>, 447 U.S. 102, 108 (1980) (observing that "the starting point for interpreting a statute is the language of the statute itself").

The revenue procedure's text reveals that to use the automatic consent procedure, a taxpayer must be seeking consent to change <u>from</u> a method of accounting described in the revenue procedure's appendix <u>to</u> a method of accounting described in that appendix.  Rev. Proc. 99-49, secs. 1, 4.01, 1999-2 C.B. at 728, 731.  Pursuant to the appendix, a taxpayer using the LIFO inventory method is eligible to seek automatic consent if the taxpayer proposes to change from the LIFO method for all of its LIFO inventory to the "permitted method".  <u>See</u> <u>id.</u> app. sec. 10.01(1)(a), 1999-2 C.B. at 752.  For a non-farmer, non-

**[*18]** securities-dealer taxpayer, a "permitted method" is one which: (1) identifies inventory using FIFO or specific identification and (2) values that inventory at cost, at the lower of cost or market, or, if the taxpayer is a retail merchant, via the retail method. Id. sec. 10.01(1)(b)(ii). If the taxpayer has non-LIFO inventory for which it already uses one of these permitted methods, then that method constitutes the only permitted method to which the taxpayer may seek to change its LIFO inventory under the revenue procedure. See id. sec. 10.01(1)(b)(i)(A).[13]

---

[13]Petitioners misinterpret these eligibility requirements as terms and conditions, actual compliance with which is required to obtain automatic consent. The wording and structure of the revenue procedure do not support their interpretation. More to the point, adopting that interpretation would vitiate the revenue procedure's scheme of automatic consent and run contrary to the clear mandate of sec. 446(e) by placing final determinative power over the issuance of the Commissioner's consent in the taxpayer's hands.

Rev. Proc. 99-49, supra, refers to "automatic" consent, but this label is something of a misnomer. The automatic consent procedure merely allows a taxpayer to assume consent once all predicate procedures have been properly followed and requirements met, subject to the Commissioner's oversight. After a taxpayer secures automatic consent to a change in method of accounting, the District Director may thereafter recommend that the change be modified or revoked if, upon review, he or she discovers that the change was based on inaccurate factual representations, that taxable income adjustments required for a change in accounting method were not made under sec. 481(a), or that applicable procedures were not followed. Rev. Proc. 99-49, sec. 9.01, 1999-2 C.B. at 736. Consent granted automatically remains revocable for cause.

Petitioners' theory would effectively shift the Commissioner's power to grant automatic consent to the taxpayer. The taxpayer would determine, after filing a complete and accurate Form 3115 along with the relevant return, whether or not to follow through on his affirmations on Form 3115, and consequently

(continued...)

[*19] A taxpayer meeting these eligibility requirements may secure automatic consent to change its method of accounting by complying with the "applicable provisions" of the revenue procedure. See Rev. Proc. 99-49, sec. 6.01, 1999-2 C.B. at 733. More specifically, to obtain automatic consent, a taxpayer must:

(1) submit before or with its timely filed income tax return for the year of the change Form 3115 signed by an individual with authority to bind the taxpayer, id. sec. 6.02(2)(a), (4), 1999-2 C.B. at 733;[14]

(2) file a copy of that Form 3115 with the IRS National Office no later than the date on which the original tax return is filed, id. sec. 6.02(2)(a);

(3) cite on Form 3115 the applicable section of the revenue procedure's appendix, id. sec. 6.02(3)(a);

---

[13](...continued)
whether the Commissioner in fact consented. Where, as here, the taxpayer files returns consistent with those affirmations but does not abide by them in practice, the Commissioner would have no way of knowing that he never consented. The Commissioner's consent would turn on the taxpayer's unreported, undisclosed inventory practices. Such an absurd result would render sec. 446(e) toothless.

[14]Sec. 1.446-1(e)(3)(i), Income Tax Regs., requires that Form 3115 be filed "with the Commissioner during the taxable year in which the taxpayer desires to make the change in method of accounting." The revenue procedure, issued under the authority of sec. 1.446-1(e)(3)(ii), Income Tax Regs., modifies this requirement. Rev. Proc. 99-49, sec. 6.02(1), 1999-2 C.B. at 733.

[*20] (4) attach to Form 3115 statements (a) identifying the taxpayer's new method of identifying its inventory, (b) identifying the taxpayer's new method of valuing its inventory, and (c) describing "in detail" how those methods conform to the requirements of Rev. Proc. 99-49, app. sec. 10.01(4), 1999-2 C.B. at 753; and

(5) if a section 481(a) adjustment is required, make that adjustment over a period of four years beginning with the year of the election, id. sec. 5.03-5.04, 1999-2 C.B. at 732.[15]

B.    What JHH Did

On its Form 3115 JHH showed that it was eligible to apply for automatic consent.  JHH unambiguously represented that it currently identified its vehicles inventory using the LIFO method and valued that inventory at cost, that it identified its non-LIFO inventory using the specific identification method and

---

[15]In addition to these listed provisions, both Rev. Proc. 97-37, sec. 6.02(5)(a), 1997-2 C.B. at 461, and Rev. Proc. 98-60, sec. 6.02(5)(a), 1998-2 C.B. at 766, required a taxpayer to include with Form 3115 an attachment stating that the taxpayer agreed to the revenue procedure's terms and conditions.  JHH did not comply with this requirement, but as of the date JHH applied for automatic consent, the requirement had been eliminated.  See Rev. Proc. 99-49, sec. 2.11(3), 1999-2 C.B. at 729.
JHH used the May 1999 revision of Form 3115.  At line 6b of Part II, Change in Valuing Inventories, of Schedule C, Change in the Treatment of Long-Term Contracts, Inventories or Other Section 263A Assets, that version of Form 3115 directs a taxpayer changing from the LIFO method to attach "[a] statement describing how the proposed method is consistent with the requirements of Regulations section 1.472-6."  JHH did not attachment this statement.

**[*21]** valued that inventory using the lower of cost or market approach, and that it proposed to identify its vehicles inventory using the specific identification method and to value it at lower of cost or market.

JHH also complied with some--but not all--of the revenue procedure's application requirements. JHH attached Form 3115 to its timely filed 2001 income tax return, designating 2001 as the year for which the change was to take effect, and also filed a copy with the IRS National Office. On its Form 3115 JHH stated that the form was filed pursuant to the automatic consent procedure of Rev. Proc. 97-37, supra. Mr. Hawse, who as JHH's president ostensibly had authority to bind the corporation, signed the form. Further, JHH agreed on the form that it would make the necessary section 481(a) adjustment and stated that the section 481(a) adjustment resulting from the change of accounting method would be a recapture of LIFO reserve of $1,084,437 over a period of four years. Consistent with its statements on Form 3115, on its 2001 tax return JHH accounted for its vehicles and non-LIFO inventory according to the specific identification method and reported income of $271,109 for that year's 25% share of the LIFO reserve recapture.

JHH did not, however, cite on Form 3115 the applicable section of the revenue procedure's appendix. Nor did it attach to Form 3115 a separate

[*22] statement describing how its new methods of identifying and valuing its inventory conformed to the requirements of Rev. Proc. 97-37, app. sec. 10.01(1)(b)(i).

At first blush these two defects may appear trivial, but the revenue procedure itself demands strict compliance: "[A] taxpayer * * * [that] changes to a method of accounting without complying with all the applicable provisions of this revenue procedure" has not obtained the Commissioner's consent.[16] See Rev. Proc. 99-49, sec. 6.06, 1999-2 C.B. at 735 (emphasis added).

This strict compliance standard makes sense. Section 446(e) mandates that taxpayers seek the Commissioner's consent to changes in their methods of accounting. The Commissioner is "vested with a wide discretion in deciding

_____

[16]When the Court determined that Rev. Proc. 97-37, supra, had been superseded by Rev. Proc. 99-49, supra, we sought comment from the parties on which procedure should apply and on the effect of any differences between them. In the status report he submitted in response to the Court's request, respondent argues that we should disregard JHH's omission of the attachment under the substantial compliance doctrine. See, e.g., Staples v. Commissioner, T.C. Memo. 2013-262, at *8 (explaining that, where in making an election a taxpayer omits one or more regulatory requirements, "if the requirements are procedural or directory, in that they do not go to the essence of the thing to be done but rather are given with a view to the orderly conduct of business, they may be fulfilled by substantial compliance"). Respondent contends that the requirement for the attachment to Rev. Proc. 99-49, supra, is merely procedural, that the information that should have been included in the attachment appeared elsewhere on JHH's Form 3115, and that JHH therefore substantially complied. For the reasons set forth in the text, we decline to adopt this reasoning.

**[*23]** whether to permit or to forbid a change." Brown v. Helvering, 291 U.S. 193, 204 (1934). As a general rule, when a taxpayer requests consent to a change in method of accounting, the Commissioner's consent to that request must be affirmative to be effective--that is, the Commissioner must notify the taxpayer its request has been granted. See sec. 1.446-1(e)(3)(i), Income Tax Regs. Although the Commissioner has elected to define the terms under which his consent to a request may be presumed, see id. subdiv. (ii); Rev. Proc. 99-49, supra, presuming consent when a taxpayer's request varies from those terms would be antithetical to the concept of discretion and would undermine the purposes of section 446(e), see, e.g., Barber v. Commissioner, 64 T.C. 314, 319-320 (1975) (explaining that treatment of a taxpayer's election of an accounting method as binding absent consent of the Commissioner to a change serves to, inter alia, "prevent administrative burdens and inconvenience in administering the tax laws" as well as "to promote consistent accounting practice thereby securing uniformity in collection of the revenue").

**[*24]**  Consequently, we hold that because JHH did not comply with all the terms

and conditions of Rev. Proc. 99-49, supra, its application for automatic consent

failed.[17]

---

[17]Petitioners additionally argue that the IRS, through its agent and representative Ms. Harris, acceded to their view that JHH's failure to in fact adopt the method of accounting change it sought on Form 3115 precluded it from obtaining automatic consent.  This argument implicates the equitable estoppel doctrine.  Because we have held on another basis that JHH did not receive automatic consent, we need not closely scrutinize this argument.  Nevertheless, we note that petitioners have not established the elements of an equitable estoppel claim against respondent.  See Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 60 (1995) (describing the requirements for an equitable estoppel claim against the Government as "(1) [a] false representation or wrongful, misleading silence by the party against whom" estoppel is claimed; "(2) an error in a statement of fact and not in an opinion or statement of law; (3) ignorance of the true facts" by the taxpayer; "(4) reasonable reliance [by the taxpayer] on the acts or statements of the one against whom estoppel is claimed; and (5) adverse effects" suffered by the taxpayer as a result "of the acts or statement of the one against whom estoppel is claimed"), supplemented by 104 T.C. 417 (1995), aff'd, 140 F.3d 240 (4th Cir. 1998).

We find petitioners' evidence of Ms. Harris' representative status and alleged statements unpersuasive.  See supra note 9.  Moreover, petitioners have not refuted her testimony that, at speaking engagements, she always advises her audience that her statements represent her personal views, not those of the IRS.  Petitioners could not have relied reasonably upon Ms. Harris' personal opinions.  Moreover, whether or not Ms. Harris said what petitioners and Mr. Kawana claim she said, a Government agency like the IRS is not bound by the unauthorized statements of its agents.  See, e.g., Posey v. United States, 449 F.2d 228, 234 (5th Cir. 1971) ("[I]t is well established that the Government is not bound by the unauthorized or incorrect statements of its agents."); Sanders v. Commissioner, 225 F.2d 629, 634 (10th Cir. 1955) ("[T]he United States may not be estopped by the unauthorized acts of its agents nor may such agents waive the rights of the United States by their unauthorized acts."), aff'g 21 T.C. 1012 (1954), and rev'g

(continued...)

**[*25]** II. <u>Changes in Accounting Method</u>

We have concluded JHH did not receive automatic consent to terminate LIFO for its vehicles inventory and to use specific identification, lower of cost or market, for all inventory. As a result, we must resolve two further issues.

First, we must decide whether, notwithstanding its failure to secure respondent's automatic consent in 2001, JHH's filing of its 2001 through 2007 tax returns in accordance with a new method of accounting was a change in method of accounting. If so, second, we must ascertain whether the amended returns reflect a further change in method of accounting for which respondent's consent is again required. If it is, then because respondent has not consented to the change, JHH may not revert to the LIFO method simply by filing amended returns. <u>See, e.g.</u>, <u>Drazen v. Commissioner</u>, 34 T.C. 1070, 1075-1076 (1960).

A. <u>Change to Specific Identification</u>

In their posttrial briefs petitioners simply assume that, because respondent did not automatically consent to JHH's requested accounting method change, no change in fact occurred, and JHH was still on the LIFO method for its vehicles

---

[17](...continued)
<u>Sanders v. Andrews</u>, 121 F. Supp. 584 (W.D. Okla. 1954); <u>Boulez v. Commissioner</u>, 76 T.C. 209, 213-214 (1981) (concluding that an oral agreement entered into by an authorized agent was not binding on the IRS because applicable regulations required a written agreement), <u>aff'd</u>, 810 F.2d 209 (D.C. Cir. 1987).

[*26] inventory notwithstanding its filing of tax returns using another method. Petitioners misconstrue section 446(e). That section provides that a taxpayer "shall" secure consent "before computing his taxable income under * * * [a] new method". Sec. 446(e). The statute's use of the word "shall" creates a legal duty to seek advance consent to a change in accounting method; it does not foreclose as a factual matter any unconsented change. Section 446 itself and our caselaw make this point crystal clear.

Section 446(f) defines certain consequences of a taxpayer's failure to seek consent to a change in method of accounting--to wit, the taxpayer may not cite the absence of consent as a basis for reducing or eliminating any determined penalty or addition to tax. If it were factually impossible for a taxpayer to change its method of accounting without first securing consent, section 446(f) would serve no apparent purpose. "Under the surplusage canon we are to give effect to every provision Congress has enacted." Rand v. Commissioner, 141 T.C. 376, 390 (2013) (citing United States v. Menasche, 348 U.S. 528, 538-539 (1955)). "[W]e decline to read words out of the statute", see Tucker v. Commissioner, 135 T.C. 114, 154 (2010), aff'd, 676 F.3d 1129 (D.C. Cir. 2012), or in this instance, an entire subsection.

[*27] Moreover, as we have expressly recognized, if a "taxpayer changes the method of accounting used in computing taxable income without first requesting the Commissioner's consent, then the Commissioner would appear to have at least two choices." Sunoco, Inc. v. Commissioner, T.C. Memo. 2004-29, 87 T.C.M. (CCH) 937-25, 945 (2004). "First, the Commissioner could assert section 446(e) and require the taxpayer to abandon the new method of accounting and to report taxable income using the old method of accounting. * * * Second, the Commissioner could accept the change of accounting method and require the taxpayer to make any adjustments which might be necessary to prevent amounts from being duplicated or omitted". Id., 87 T.C.M. (CCH) at 945 (citations omitted); accord Capital One Fin. Corp. v. Commissioner, 130 T.C. 147, 155 (2008), aff'd, 659 F.3d 316 (4th Cir. 2011). Indeed, section 446(e) affords the Commissioner "the power * * * to grant retroactive changes in accounting methods" as well as prospective ones. See Barber v. Commissioner, 64 T.C. 314, 319 (1975).

Respondent elected the latter course. For 2001 through 2007 JHH accounted for its inventory on its income tax returns using the specific identification method. Respondent examined JHH's 2002 and 2003 returns and, in the notice of deficiency mailed January 6, 2012, determined that JHH had

[*28] "revoked its LIFO election * * * effective January 1, 2001". To the extent that JHH changed its method of accounting, respondent has plainly accepted the change.[18]

We qualify the foregoing statement only because we have not yet established that, by filing returns using the specific identification method, JHH did in fact change its method of accounting. Petitioners contend that their manner of accounting for inventory on JHH's original returns represented mere error, such that filing amended returns was necessary to correct that error. This argument begs the question whether JHH ever changed its method of accounting.

---

[18]Historically, this Court and others have held that the Commissioner's consent to a change in method of accounting may be implied if the Commissioner has, over a sufficient period of years, accepted without response or comment a taxpayer's income tax returns filed using a new method of accounting. See, e.g., Fowler Bros. & Cox v. Commissioner, 138 F.2d 774, 775-776 (6th Cir. 1943), aff'g 47 B.T.A. 103 (1942); S. Rossin & Sons, Inc. v. Commissioner, 113 F.2d 652, 654 (2d Cir. 1940), rev'g 40 B.T.A. 1274 (1939); Geometric Stamping Co. v. Commissioner, 26 T.C. 301, 304-305 (1956); Linen Thread Co., Ltd. v. Commissioner, 14 T.C. 725, 732-733 (1950). We have alluded to this "implied consent" doctrine without applying it in more recent cases. See Barber v. Commissioner, 64 T.C. 314, 318 (1975); Perry v. Commissioner, T.C. Memo. 1990-228, 59 T.C.M. (CCH) 533, 536 (1990). We need not apply the doctrine in the instant case because respondent, in the notice of deficiency and throughout this litigation, has taken the position that JHH's application for automatic consent was effective--that is, that he did give consent. Sec. 446(e) empowers the Commissioner to grant consent retroactively. See Barber v. Commissioner, 64 T.C. at 319. Thus, notwithstanding the failure of JHH's 2001 application for automatic consent, respondent evidently approved the applied-for change at some point thereafter.

[*29] The Code does not define the phrase "method of accounting". The Court has held that the phrase includes "the consistent treatment of any recurring material item, whether that treatment be correct or incorrect." See Bank One Corp. v. Commissioner, 120 T.C. 174, 282 (2003), aff'd in part, vacated in part on other grounds and remanded sub nom. J.P. Morgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006); H.F. Campbell Co. v. Commissioner, 53 T.C. 439, 447 (1969), aff'd, 443 F.2d 965 (6th Cir. 1971). The regulations under section 446 define "method of accounting" as including "not only the over-all method of accounting of the taxpayer but also the accounting treatment of any item." Sec. 1.446-1(a)(1), Income Tax Regs.

Those same regulations explain that a change in accounting method includes: (1) "a change in the overall plan of accounting for gross income or deductions" or (2) "a change in the treatment of any material item used in such overall plan." Id. para. (e)(2)(ii)(a). A material item, in turn, "is any item that involves the proper time for the inclusion of the item in income or the taking of a deduction." Id. That is, an item is a material item if a change in its treatment will not change a taxpayer's lifetime income but will instead merely postpone or accelerate the taxpayer's reporting of income. See, e.g., Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 510 (1989). With respect to inventories specifically,

**[\*30]** "[a] change in an overall plan or system of identifying or valuing items in inventory" or "a change in the treatment of any material item used in the overall plan for identifying or valuing items in inventory" constitutes a change in accounting method. Sec. 1.446-1(e)(2)(ii)(c), Income Tax Regs.

Conversely, "[a] change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability". Id. subdiv. (ii)(b). A "mathematical" error is "an error in addition, subtraction, multiplication, or division". Sec. 6213(g)(2)(A); Capital One Fin. Corp. v. Commissioner, 130 T.C. at 166; Huffman v. Commissioner, 126 T.C. 322, 343-344 (2006), aff'd, 518 F.3d 357 (6th Cir. 2008). "A posting error is an error in 'the act of transferring an original entry to a ledger.'" Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. at 510-511 (quoting Black's Law Dictionary 1050 (5th ed. 1979)). Where error correction "results in a change of accounting method", however, the consent requirement of section 446(e) applies. See Huffman v. Commissioner, 126 T.C. at 354.

The line between a change in accounting method and mere error (or its correction) is a fine one. In Huffman, we exhaustively reviewed our caselaw and that of other courts dealing with what constitutes an accounting method change. See id. at 345-354. Recognizing inconsistencies in our prior caselaw, we

**[\*31]** emphasized that "it is the consistent treatment of an item involving a question of timing that establishes such treatment as a method of accounting." Id. at 354. For that reason, "a short-lived deviation from an already established method of accounting need not be viewed as a establishing a new method of accounting." Id. And in that case, "neither the deviation from, nor the subsequent adherence to, the method of accounting would be a change in method of accounting." Id.

As we observed in Huffman: "The question, of course, is what is short-lived." Id. The Court has answered this question in various ways. We have suggested that a two-year deviation can establish a new method of accounting. See Johnson v. Commissioner, 108 T.C. 448, 494 (1997) ("If the change [in reporting method] affects the amount of taxable income for 2 or more taxable years without altering the taxpayer's lifetime taxable income, then it is strictly a matter of timing and constitutes a change in method of accounting."), aff'd in part, rev'd in part on other grounds, 184 F.3d 786 (8th Cir. 1999); see also Capital One Fin. Corp. v. Commissioner, 659 F.3d at 326 ("Treatment of a material item consistently in two or more consecutively filed tax returns constitutes a method of accounting for which consent is required to change--even if that treatment is erroneous or an incorrect application of a chosen method."). We have also firmly

[*32] held that a 10-year deviation, consistently followed, reflects a change in method of accounting. Huffman v. Commissioner, 126 T.C. at 354.

As we said in Huffman: "We need not today determine how long is short." Id. JHH deviated from its previously established LIFO method on seven consecutively filed tax returns, from 2001 through 2007, before seeking to amend its returns. JHH consistently used the specific identification method for its vehicles inventory for a seven-year period. Because use of the specific identification method rather than the LIFO method accelerated JHH's recognition of vehicle sales income, see supra note 4, it involved a question of timing. Regardless of the upper temporal boundary of a "short-lived deviation", we think that seven years lies beyond it. JHH's "consistent treatment of an item involving a question of timing * * * establishes such treatment as a method of accounting." See Huffman v. Commissioner, 126 T.C. at 354. Notwithstanding its failure to secure respondent's automatic consent, JHH changed its method of accounting from LIFO by accounting for its vehicles inventory on the specific identification method on its 2001 through 2007 tax returns.

B.    Reversion to LIFO

Petitioners hang their hats on the argument that they did not receive respondent's consent to terminate LIFO in 2001 and the assumption that, in the

[*33] absence of such consent, a change in accounting method simply cannot occur. From these premises, they reason that JHH's attempt to restore the LIFO method reflects simply the correction of error for which no consent is needed. They do not confront whether, if JHH did change its method of accounting in 2001, albeit without the required consent, JHH's amended returns reflect a second change in method of accounting. Respondent contends that at least some of the changes on JHH's amended returns are changes in the treatment of material items and thus changes in method of accounting for which respondent's consent was required but not granted.[19]

---

[19]In their briefs the parties debate whether changing from an erroneous method of accounting to a proper one requires the Commissioner's consent. As framed, their dispute would appear to be resolved by sec. 446(e), which by its terms applies to all changes in method of accounting, and by sec. 1.446-1(e)(2)(i), Income Tax Regs., which expressly brings a change from an improper or unpermitted method of accounting within the ambit of sec. 446(e). The more relevant question is whether a taxpayer's change in reporting constitutes a "change in method of accounting" within the scope of the statute.

Pointing to a footnote in S. Pac. Transp. Co. v. Commissioner, 75 T.C. 497, 682 n.208 (1980), supplemented by 82 T.C. 122 (1984), petitioners insist that governing caselaw holds that changing from an erroneous method to a proper method does not require consent. As petitioners expressly recognize, however, the actual issue in that case was not whether the taxpayer could change its accounting method without the Commissioner's consent, but rather whether the proposed change in reporting was in fact a change in accounting method, so the footnote on which petitioners rely is merely dictum. Moreover, the tax years at issue in that case were 1959-1961, see id. at 505, so this Court had no need to consider the effect of T.D. 7073, 1970-2 C.B. 98, which brought change from an improper or

(continued...)

**[*34]** As we have concluded above, although JHH did not receive automatic consent, it nevertheless changed from the LIFO method of accounting to the specific identification method for its vehicles inventory in 2001. JHH's attempt to revert to the LIFO method with its amended returns constitutes a second attempted change in method of accounting under our caselaw and both alternative definitions in the regulations.

We have held "that a taxpayer does change its method of accounting when it changes its treatment of an item in order to adhere to a method adopted pursuant to a prior accounting election." See Capital One Fin. Corp. v. Commissioner, 130 T.C. at 169 (citing Sunoco, Inc. v. Commissioner, T.C. Memo. 2004-29, and First Nat'l Bank of Gainesville v. Commissioner, 88 T.C. 1069 (1987)); see also Huffman v. Commissioner, 126 T.C. at 352-354 (analyzing whether and under what circumstances "a taxpayer does not change its method of accounting when it merely conforms to a prescribed (but ignored) method of accounting", recognizing inconsistencies in prior caselaw, and concluding that by ignoring the prescribed method, the taxpayer had established a new method of accounting). On its amended returns JHH changed its treatment of its vehicles inventory to adhere to

[19](...continued)
unpermitted method expressly within the scope of sec. 1.446-1(e)(2)(i), Income Tax Regs.

**[\*35]** its previously elected LIFO method, and this change constituted a change in method of accounting.

Second, a change from specific identification to LIFO is a change in an overall plan or system of identifying items in inventory and thus qualifies as a change in method of accounting. See sec. 1.446-1(e)(2)(ii)(c), Income Tax Regs (providing that "[a] change in an overall plan or system of identifying or valuing items in inventory" constitutes a change in method of accounting for purposes of section 446(e)).

Third, the two changes that JHH proposed to make with its amended returns involve material items. The first change reversed the section 481(a) recapture of LIFO reserve that JHH had earlier included on its 2001, 2002, and 2003 income tax returns. The second change computed LIFO reserve amounts for tax years 2001, 2002, and 2003 and deducted them. Section 481(a) adjustments constrain the extent of income deferral attained through use of the LIFO method. When a taxpayer terminates LIFO, section 481(a) mandates inclusion in income of the LIFO reserve. Absent LIFO termination, inclusion of the LIFO reserve would occur only upon liquidation or reduction of inventory. JHH's reversal of the section 481(a) adjustment and deduction of additional LIFO reserve amounts retroactively postponed its recognition of LIFO reserve. Hence, both changes

[*36] relate to the proper timing of income and so amount to changes in the treatment of material items. See sec. 1.446-1(e)(2)(ii)(a), (c), Income Tax Regs.

Accordingly, under our caselaw and under either prong of the definition in section 1.446-1(e)(2)(ii)(a), Income Tax Regs., the changes that JHH made on its amended returns constitute a retroactive change in method of accounting for which respondent's consent was required. Respondent was well within his discretion to refuse such consent and to refuse to accept JHH's amended returns. See Badaracco v. Commissioner, 464 U.S. 386, 393 (1984) (observing that "the Internal Revenue Code does not explicitly provide either for a taxpayer's filing, or for the Commissioner's acceptance, of an amended return" and that consequently "an amended return is a creature of administrative origin and grace"); Capitol Fed. Sav. & Loan Ass'n v. Commissioner, 96 T.C. 204, 211 (1988) (describing whether to permit a taxpayer to change its method of accounting as "a matter within the discretion of the Commissioner").

III.   Conclusion

JHH did not receive automatic consent under Rev. Proc. 99-49, supra, to change its method of accounting for its LIFO inventory to specific identification. Notwithstanding its failure to obtain the consent required by section 446(e), by consistently accounting for that inventory on its 2001 through 2007 income tax

[*37] returns using the specific identification method, JHH changed its method of accounting. JHH's proffered amended returns, on which it attempted to revert to the LIFO method, reflect a second change in method of accounting to which respondent may refuse consent under section 446(e). JHH did not obtain that consent. Accordingly, respondent was entitled to reject JHH's amended returns, and petitioners are not entitled to their claimed refunds.

To reflect the foregoing,

Decision will be entered under Rule 155.